UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| PETER GACICIA, individually and on behalf of a class of similarly situated persons, | : |
| Plaintiffs, | :   Civil Action No. 1:05-CV-11204-WGY |
| vs. | : |
| GAF BUILDING MATERIALS CORPORATION, GAF CORP. AND SAMUEL HEYMAN, | : |
| Defendants. | : |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS, OR, IN THE ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT**

**Preliminary Statement**

Plaintiff Peter Gacicia and his counsel, Kenneth G. Gilman, Esq., seek to pursue claims that have already been pursued in a class action that was brought in 1996 and thereafter settled on a class-wide basis in 1998. Although Mr. Gacicia opted out of the class, his new claims are time-barred as well as jurisdictionally invalid. Disturbingly, Plaintiff and his counsel know this, having been intimately involved in the class action and having participated in a deposition in which Mr. Gacicia testified that he was on notice of the claims at issue since at least November of 1995.

Mr. Gilman filed a class action Complaint in Alabama against the same defendants (except for an inexplicably-named new defendant, Samuel Heyman) alleging the same facts and the same causes of action. Mr. Gacicia was an identified plaintiff in that matter, and was deposed regarding the same roof-related problems that he complains of in the new Complaint. In his deposition, Mr. Gacicia stated that he had problems with his roof – the same problems complained of now – in November of 1995. Although Mr. Gacicia opted out of the class action

settlement, he never pursued his claims until now. As set forth below, all of his claims are time-barred.

Not only are all of the claims time-barred, the Complaint fails to identify the proper defendant (Building Materials Corporation of America), sues an individual defendant over whom no personal jurisdiction exists (Samuel Heyman), and sues two corporate defendants who no longer exist and are immune from suit in this forum (GAF Building Materials Corporation and GAF Corporation). The proper defendant in this case – previously identified in the class action settlement – is Building Materials Corporation of America ("BMCA"). BMCA is the only entity responsible for the manufacture and sale of the shingles at issue and the caption in this action should be modified accordingly.

Rather than bringing the action against BMCA, Plaintiff inexplicably has chosen to file suit against Samuel Heyman, the "purported owner" of the former GAF Corporation. As Plaintiff should or does know, Mr. Heyman is not personally subject to the jurisdiction of the Massachusetts' courts. Mr. Heyman has no contacts with Massachusetts that would warrant the application of the Massachusetts Long-Arm Statute or comport with the proper exercise of due process. In addition, Mr. Heyman was never properly served with the Summons and Complaint.

Nor is the action against GAF Building Materials Corporation or GAF Corporation proper. These corporate defendants no longer exist and are immune from suit. As a result of various corporate transactions, G-I Holdings Inc. is the successor by merger to defendants GAF Building Materials Corporation and GAF Corporation. G-I Holdings Inc. is now a debtor in a Chapter 11 bankruptcy proceeding pending in the U.S. Bankruptcy Court for the District of New Jersey. Any action against G-I Holdings Inc. as successor by merger to defendants GAF

Building Materials Corporation and GAF Corporation violates the automatic stay imposed pursuant to 11 U.S.C. § 362 and is void *ab initio*.

For the foregoing reasons and as set forth in detail below, Mr. Gacicia's new Complaint should be dismissed pursuant to <u>Fed. R. Civ. P.</u> 56 and <u>Fed. R. Civ. P.</u> 12 (b)(2)(5)(6).

<div align="center"><u>**Statement of Undisputed Facts**</u></div>

**I.     The *Coleman* Case**

1.      The Superior Court of Alabama received a nearly identical version of the instant Complaint in 1996, filed by the same attorney, asserting the same claims, and pleading the same facts.  The parties settled that lawsuit, entitled <u>Coleman v. GAF Building Materials Corp.,</u> CV-96-0954-GALANOS ("*Coleman*"), in 1998.

**A.     Claims in *Coleman***

2.      Kenneth G. Gilman, Esq., as class counsel, filed the Complaint in *Coleman* in the Circuit Court of Mobile County, Alabama, on March 20, 1996.  That Complaint contained causes of action for fraud, deceptive trade practice, and breach of express and implied warranties.  <u>See</u> Affidavit of Jonathan Sablone ("Sablone Aff."), Exh. A.

**B.     Mr. Gacicia's Involvement in *Coleman***

3.      Mr. Gacicia was an identified plaintiff class member in *Coleman*, and had his deposition taken in connection with that action on December 10, 1996 at the law offices of his attorney, Mr. Gilman.  <u>See</u> Sablone Aff., Exh. B.  In his deposition, Mr. Gacicia stated that his house was located at 174 Hillside Road in Milton, Massachusetts.  <u>Id</u>. at 22:20-21.  He contracted to have the house built for him and he moved into the house around June of 1987.  <u>Id</u>. at 23:2-6; 35:22 to 36:1-2.  He selected GAF-manufactured "Timberline" shingles for his roof.  <u>Id</u>. at 35:1-17.  He testified that he first became aware that his roof was leaking and that his

shingles were cracking or splitting in November, 1995. Id. at 69:2-19; 89:8-18. He notified GAF of the problem on February 28, 1996. Id. at 69:21-22; 70:2-8; 114:11-14.

4.    Despite his personal involvement in the Alabama class action, Mr. Gacicia opted out of the settlement on March 11, 1999. See Sablone Aff., Exh. C.

**C.    Settlement in *Coleman***

5.    On September 24, 1998, plaintiffs and defendants in the *Coleman* lawsuit jointly filed a Proposed Stipulation of Settlement and Motion for Conditional Class Certification, and the Honorable Chris Galanos conditionally certified the class on the following day. See Sablone Aff., Exh. D.

6.    On November 2, 1998, Judge Galanos approved the Notice Plan submitted to the Court. See Sablone Aff., Exh. E. The notice apprised class members of the nature of the action, that a hearing would be held, that class members could opt out of the class, that class members who failed to opt out would be bound by the judgment, and that the court file was available for examination. Id.

7.    After a satisfactory evidentiary hearing on March 12, 1999, Judge Galanos approved the Settlement Agreement and entered a Final Order and Judgment on April 16, 1999. See Sablone Aff., Exh. F. That agreement settled and released claims arising out of "damage" to GAF shingles and provided an exclusive claims procedure by which the class members could obtain compensation from GAF for such damage. Id.

8.    The parties to the *Coleman* action spent an enormous amount of energy, time and money resolving the class action claims. Now, more than six years after the settlement, Messrs. Gilman and Gacicia want to do it all over again.

## II.      The New Massachusetts Class Action Complaint

9.      Mr. Gilman filed the instant class action Complaint, naming Mr. Gacicia as plaintiff, on February 11, 2005 in the Superior Court, Department of the Trial Court for the Commonwealth of Massachusetts, County of Middlesex, Civil Action No. 05-493.  On June 6, 2005, defendants Building Materials Corporation of America ("BMCA") and Samuel Heyman properly removed the action to this Court.

10.      The Complaint alleges that Mr. Gacicia purchased Timberline asphalt shingles "manufactured by defendant GAF."  See Complaint ¶7.  It alleges that sometime after purchase and within the 25-year warranty period, Mr. Gacicia's shingles "deteriorated badly and the roof began to leak."  Id.

11.      Not only does the latest Complaint assert the exact same claims (fraud, deceptive trade practice, and breach of express and implied warranties), but it is virtually a word-for-word copy of the *Coleman* Complaint and purports to cover a nearly identical time period (January 1, 1979 to the present).

12.      For example, the *Coleman* Complaint alleged in Section I "Nature of the Action," Paragraph 3 that:

> GAF's shingles, manufactured during the class period set forth in paragraph 35, are uniformly defective and, when exposed to normal climactic conditions, prematurely split, crack, curl, buckle, develop seal down problems and otherwise deteriorate.  The shingles owned by plaintiffs and class members either already have manifested these defects (thereby causing damages such as the cost of removing and replacing the defective shingles) or will manifest these defects prior to the expiration of the applicable written warranty given by GAF.  The premature splitting, cracking, curling, buckling and blow-offs of GAF shingles occur at a rate extraordinarily higher than that of other commonly used and non-defective shingles.

Sablone Aff., Exh. A at 2.

13.    Using nearly identical language, the new Complaint alleges in Section I "Nature of the Action," Paragraph 3 that:

> GAF's shingles, manufactured during the class period, are uniformly defective and, when exposed to normal climactic conditions, prematurely split, crack, curl, buckle, develop seal down problems and otherwise deteriorate. The shingles owned by plaintiffs and class members either already have manifested these defects (thereby causing damages such as the cost of removing and replacing the defective shingles) or will manifest these defects prior to the expiration of the applicable written warranty given by GAF. The premature splitting, cracking, curling, buckling and blow-offs of GAF shingles occur at a rate extraordinarily higher than that of other commonly used and non-defective shingles.

Complaint at 1-2.

## III.    The Named Defendants

### A.    Defendant Samuel Heyman

14.    Plaintiff identifies Samuel Heyman as "the owner of GAF Corporation with its principal place of business in Newark, New Jersey." Complaint ¶8(c). GAF Corporation no longer exists and is immune from suit.

15.    Plaintiff also alleges that "[t]hroughout the Class Period, Samuel Heyman has transacted business in the Commonwealth of Massachusetts." Id. Mr. Heyman does not personally conduct business in Massachusetts. Heyman Aff., ¶¶ 2-3.

16.    Plaintiff alleges no further facts regarding Samuel Heyman in the remainder of the 52-count Complaint. He also does not request any specific relief against Mr. Heyman.

17.    On or about May 6, 2005, Plaintiff sent the Summons and Complaint to Samuel Heyman by certified mail. The Summons and Complaint was sent to "Samuel Heyman, President to Accept Service for GAF Building Materials Corporation, 1361 Alps Road, Wayne, NJ 07470." See Sablone Aff., Exh. G. Mr. Heyman does not have an office in Wayne, New Jersey and did not sign for the certified mail. Heyman Aff., ¶¶ 4-5.

**B.**    **Defendants GAF Building Materials Corporation and GAF Corporation**

18.    As a result of various corporate transactions, G-I Holdings Inc. is the successor by merger to defendants GAF Building Materials Corporation and GAF Corporation. G-I Holdings Inc. is now a debtor in a Chapter 11 bankruptcy proceeding pending in the U.S. Bankruptcy Court for the District of New Jersey. See In re: G-I Holdings Inc., et al., U.S. Bankruptcy Court for the District of New Jersey, Case Nos. 01-30135 (RG) and 01-38790 (RG) (Jointly Administered). As such, defendants GAF Building Materials Corporation and GAF Corporation no longer exist and are immune from suit in this forum.

**IV.    The Proper Defendant - BMCA**

19.    BMCA is the corporate entity responsible for the manufacture and sale of the shingles at issue in this action. As such, BMCA is the proper defendant for purposes of this matter and the caption should be modified accordingly.

<u>**Argument**</u>

**I.    THE COMPLAINT SHOULD BE DISMISSED IN ITS ENTIRETY ON THE GROUNDS THAT EVERY CLAIM (REGARDLESS OF WHO HAS BEEN SUED) IS TIME-BARRED**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a Complaint must be dismissed if it fails to state a legal claim on which relief may be granted against the defendant. Claims that are barred by the applicable statute of limitations are candidates for dismissal on a motion. See, e.g., Rodi v. Southern New England School of Law, 389 F.3d 5, 17 (1st Cir. 2004) (A statute of limitations defense can be considered on a Rule 12(b)(6) motion).

Federal Rule of Civil Procedure 12(b)(6) specifically gives the court discretion to accept and consider extrinsic materials offered in conjunction with a Rule 12(b)(6) motion. See Fed. R. Civ. P. 12(b)(6). If the court decides to accept "matters outside of the pleadings," the motion is treated as one for summary judgment and disposed of as provided in Rule 56. Santiago v.

Canon, U.S.A., Inc., 138 F.3d 1, 4 n.5 (1st Cir. 1998) (Plaintiffs invited conversion by attaching sworn statement to their response to motion to dismiss); Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 283 n.7 (5th Cir. 1993) (When matters outside of pleadings are considered, claim is converted into motion for summary judgment).

The conversion option is especially appropriate in cases (like this one) in which the extrinsic evidence is incontrovertible and establishes that the relevant claims are time-barred. See, e.g., Alioto v. Marshall Field's & Co., 77 F.3d 934, 936 (7th Cir. 1996) (Court looked to plaintiff's deposition in ruling that claim was time-barred).

A.    **Each Cause Of Action In The Complaint Is Barred By The Applicable Statute Of Limitations and Summary Judgment Should be Granted Pursuant to Federal Rule of Civil Procedure 56**

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party has the burden to show there is no genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

Once the moving party has met its burden, the party opposing summary judgment may not simply rely on the pleadings or mere denials of the allegations. Rather, the opposing party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]" Id. In other words, the party opposing summary judgment "must do more than simply show that there is some

-8-

metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 586 (1986).

The Supreme Court consistently has emphasized that "[s]ummary judgment is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex</u>, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). Summary judgment is especially appropriate in cases like this where the record conclusively demonstrates that the claims are time-barred. <u>See</u>, <u>e.g.</u>, <u>Nunheimer v. Continental Insurance Company</u>, 68 F. Supp.2d 75, 77 (D. Mass. 1999) ("Summary Judgment is appropriate with respect to a statute of limitations defense where there is no dispute as to essential evidentiary facts controlling the application of the statute of limitations"); <u>Stone & Webster Engineering Corporation v. Duquesne Light Company</u>, 79 F. Supp.2d 1, 6 (D. Mass. 2000) ("Summary judgment may be particularly appropriate with regard to statute of limitations defenses and other time-bar issues ….").

As set forth below, each and every one of Plaintiff's claims are time-barred. Disturbingly, Plaintiff and Plaintiff's counsel knew this and elected to proceed anyway.

**1.      The Fraud Count is Both Improperly Plead and Time-Barred**

Count One of the Complaint is intended to plead a cause of action for "Fraud by Nondisclosure." The Complaint defines the "Fraud Subclass" as comprised of "All persons who purchased GAF shingles or who currently own buildings or real property located in Alabama, Florida, and/or Indiana. . . . Alabama, Florida and Indiana are hereinafter referred to collectively as the 'Fraud States.'" <u>See</u> Complaint ¶35(d). Mr. Gacicia is a resident of the Commonwealth of Massachusetts. <u>Id</u>. at ¶7. Accordingly, Mr. Gacicia is not a member of the "Fraud Subclass,"

and asserts no cause of action under Massachusetts law in the First Count for "Fraud by Nondisclosure."

Setting aside this clear deficiency, even if Mr. Gacicia intended to file a fraud claim under Massachusetts law, such claim is time-barred. Mr. Gacicia pleads that he purchased roofing shingles that needed to be replaced, and which required "Plaintiff to incur actual replacement costs." Id. As explained in the Statement of Undisputed Facts, Mr. Gacicia knew of this claim since November, 1995 (if not before). Under Mass. Gen. Laws ch. 260, § 2(a), a tort action for fraud/misrepresentation has a three year statute of limitation period which begins to run from the time that a cause of action accrues, which is when the plaintiff knew or should have known of the facts and injury giving rise to the claim. See, e.g., Rodi v. Southern New England School of Law, 389 F.3d 5, 17 (1st Cir. 2004) (Action for fraudulent misrepresentation shall be commenced within three years after cause of action accrues; action accrues when plaintiff learns or reasonably should have learned of the misrepresentation); Kent v. Dupree, 13 Mass. App. Ct. 44, 47 (1982) (Statute of limitations for fraud claims is three years after the plaintiff learns or reasonably should have learned of the alleged misrepresentation). Since Mr. Gacicia actually knew of the facts supporting his purported claim in November 1995, his fraud claim is time-barred and summary judgment should be granted in favor of the defendants.

**2.    The Consumer Protection Claim is Time-Barred**

In Count Two, Mr. Gacicia, as a Massachusetts resident, seeks relief under the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A. Claims under this Act

> are governed by a four-year limitations period with an accrual date that is determined "by the same principles as govern the determination of the underlying actions." Schwartz v. Travelers Indem. Co., 50 Mass. App. Ct. 672, 678, 740 N.E.2d 1039 (2001), quoting from Hanson Housing Authority v. Dryvit Sys., Inc., 29 Mass. App. Ct. 440, 448, 560 N.E.2d 1290 (1990). Therefore, as

to the c. 93A claims, the statute begins to run from the date of
discovery of the defects. . . .

Fine v. Huygens, DiMella, Shaffer & Assoc., 57 Mass. App. Ct. 397, 404 (Mass. App. Ct. 2003);

See also Levin v. Berley, 728 F.2d 551, 555 (1st Cir. 1984)("the relevant statute of limitations for

a Chapter 93A claim is four years"); Behn v. Legion Insurance Company, 173 F. Supp.2d 105,

112-13 (D. Mass. 2001) (Stating that Ch. 93A begins to run when the plaintiff knew or should

have known of appreciable harm resulting from the defendant's actions).   Since Mr. Gacicia

"discovered the defects" in his roof more than four years ago, his consumer protection claim is

time-barred and summary judgment should be granted in favor of the defendants.

**3.      The Breach of Express Warranty Claim is Time-Barred**

As an action involving the sale of goods, Mr. Gacicia's warranty claims are governed by

Article 2 of the Uniform Commercial Code (U.C.C.).  Cambridge Plating Co. v. Napco, Inc., 991

F.2d 21, 24 (1st Cir. 1993); Rosario v. M.D. Knowlton Co., 54 Mass. App. Ct. 796, n.7 (Mass.

App. Ct. 2002).  The statute of limitations for warranty claims is four-years.  M.G.L.A. 106 § 2-

725.  The relevant U.C.C. section reads as follows:

> (1) An action for breach of any contract for sale must be
> commenced within four years after the cause of action has accrued.
> By the original agreement the parties may reduce the period of
> limitation to not less than one year but may not extend it.
>
> (2) A cause of action accrues when the breach occurs, regardless of
> the aggrieved party's lack of knowledge of the breach.  A breach
> of warranty occurs when tender of delivery is made, except that
> where a warranty explicitly extends to future performance of the
> goods and discovery of the breach must await the time of such
> performance the cause of action accrues when the breach is or
> should have been discovered.

Mr. Gacicia has plead that "GAF" offered a warranty that explicitly extended to future

performance of the shingles.  As such, his express warranty claim "accrued" when he discovered

or should have discovered the alleged breach.   Mr. Gacicia testified that he discovered the

alleged breach on or about November, 1995. As such, the four-year statute of limitations has long since run and summary judgment should be granted in favor of the defendants.

**4.    The Breach of Implied Warranty Claim is Time-Barred**

Mr. Gacicia's claim for breach of implied warranty of merchantability or fitness for a particular purpose under the U.C.C. is also time-barred. The U.C.C. imposes a four-year statute of limitations for breach of implied warranty claims. Breach of implied warranty claims must be brought within four-years from the date of sale. See Mass. Gen. Laws ch. 106, § 2-725 (a cause of action for breach of the implied warranty "accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made. . ."); see also Coady v. Marvin Lumber and Cedar Co., 167 F. Supp.2d 166, 169 (D. Mass. 2001) (Stating that "a breach of warranty occurs when tender of delivery is made ….."); Bay State-Spray & Provincetown S.S., Inc. v. Caterpillar Tractor Co., 404 Mass. 103 (1989) (Applying § 2-725 to bar a warranty claim where the plaintiff filed the Complaint more than four-years after "tender of delivery" occurred); New England Power Co. v. Riley Stoker Corp., 20 Mass. App. Ct. 25 (Mass. App. Ct.), review den., 395 Mass. 1103 (1985) (Finding that "tender of delivery" commenced running of four-year statute for warranty claims).

As set forth in the Statement of Undisputed Facts, Mr. Gacicia purchased his shingles in or about 1987. As such, the four-year statute of limitations has long since run and summary judgment should be granted in favor of the defendants.

**5.    The Magnuson-Moss Warranty Claim is Time-Barred**

The Magnuson-Moss Warranty Act contains no express statute of limitations. As such, for statute of limitations purposes, courts look to the most analogous state statute. See Holmberg v. Armbrecht, 327 U.S. 392, 395 (1946) ("The implied absorption of State

statutes of limitation within the interstices of the federal enactments is a phase of fashioning

remedial details where Congress has not spoken but left matters for judicial determination

within the general framework of familiar legal principles").  With respect to the Magnuson-

Moss Warranty Act, courts use the statute of limitations period applicable to U.C.C.

warranty claims.  See, e.g., Hillery v. Georgie Boy Mfg., Inc., 341 F. Supp.2d 1112, 1114

(D. Ariz. 2004) (applying state warranty law to determine statute of limitations under

Magnuson-Moss Warranty Act).  As such, Mr. Gacicia's Magnuson-Moss warranty claim is

time-barred for the same reasons that his express and implied warranty claims are time

barred and summary judgment should be granted in favor of the defendants.

II.    **THIS COURT LACKS PERSONAL JURISDICTION OVER MR. HEYMAN AND ALL CLAIMS AGAINST HIM SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(2)**

Even if all claims against Mr. Heyman are not time-barred – and they are – this Court

should still dismiss the claims against him for lack of *in personam* jurisdiction.   More

specifically, this Court may not exercise personal jurisdiction over Mr. Heyman as he is not a

resident of Massachusetts, and neither the Massachusetts long-arm statute nor the constitutional

requirement of minimum contacts are satisfied by the facts alleged in the Complaint.  When, as

here, the assertion of *in personam* jurisdiction has been challenged under Fed. R. Civ. P.

12(b)(2), the plaintiff must "prove the facts upon which the existence of personal jurisdiction

depends." Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995).

See also Chlebda v. H.E. Fortna & Bro., Inc., 609 F.2d 1022, 1024 (1st Cir. 1979) ( Plaintiff must

go beyond the pleadings and make affirmative proof).  The Plaintiff must show "the existence of

every fact required to satisfy both the forum's long-arm statute and the Due Process Clause of

the Constitution." United Elec. Radio & Mach. Workers of Am. v. 163 Pleasant St. Corp., 987

F.2d 39, 43-44 (1ˢᵗ Cir. 1993). Although the court will "take specific facts affirmatively alleged by the plaintiff as true, ... [it will not] credit conclusory allegations or draw farfetched inferences." <u>Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n.</u>, 142 F.3d 26, 34 (1ˢᵗ Cir. 1998); <u>Ticketmaster-New York, Inc. v. Alioto</u>, 26 F.3d 201, 203 (1ˢᵗ Cir. 1994). In fact, a plaintiff must do more than simply surmise the existence of favorable facts; he must verify the facts through materials of evidentiary quality. <u>Foster-Miller, Inc. v. Babcock & Wilcox Canada</u>, <u>supra</u>, 46 F.3d at 145.

The Massachusetts long-arm statute identifies five types of conduct that would permit the exercise of personal jurisdiction over an out-of-state defendant: (1) transacting business in the state; (2) contracting to supply goods or things within the state; (3) causing tortious injury in the state under certain circumstances; (4) having an interest in or possessing personal property in the state; or (5) entering into certain types of insurance contracts in the state. <u>Mass. Gen. Laws</u> ch. 223A, § 3. Based on the allegations of the Complaint, the question is whether Mr. Heyman may be deemed to have been "transacting business" in the Commonwealth of Massachusetts within the meaning of <u>Mass. Gen. Laws</u> ch. 223A, § 3(a), a determination which is based on the extent of his participation in Massachusetts commerce. <u>Lyle Richards Int'l, Ltd. v. Ashworth, Inc.</u>, 132 F.3d 111, 112 (1ˢᵗ Cir. 1997).

Plaintiff has not alleged any facts to support the notion that Mr. Heyman "transacts business" in Massachusetts. The only mention of Mr. Heyman in the entire Complaint comes in the caption and in paragraph 8(c), which merely alleges that "Samuel Heyman is the owner of GAF Corporation with its principal place of business in Newark, New Jersey. Throughout the Class Period, Samuel Heyman has transacted business in the Commonwealth of Massachusetts." Complaint ¶8(c). Aside from this one barebones reference, there is nothing in the Complaint to

support the exercise of personal jurisdiction over Mr. Heyman.  More specifically, Plaintiff has

not shown that Mr. Heyman has personally engaged in any jurisdictionally relevant activities

within Massachusetts, let alone that his activities in the state are sufficient to pass the test of due

process.  Moreover, as Mr. Heyman's affidavit makes clear, he has not personally engaged in

any such activities.  See Heyman Aff., ¶¶2-3.

Put simply, Plaintiff's Complaint sets forth no facts which bring Mr. Heyman within the

personal jurisdiction of this Court.  Accordingly, the Complaint should be dismissed against Mr.

Heyman pursuant to Fed. R. Civ. P. 12(b)(2).  See Walsh v. Nat'l Seating Co., 411 F. Supp. 564,

569-70 (D. Mass. 1976) (Plaintiff failed to allege facts sufficient to establish long-arm

jurisdiction); A-Connoisseur Transp. Corp., supra, 742 F. Supp. at 43 (Dismissing claim based

on lack of personal jurisdiction because it would be "manifestly unfair" to require defendant to

defend itself in Massachusetts).

## III.    PLAINTIFF IMPROPERLY SERVED DEFENDANT SAMUEL HEYMAN AND THE COMPLAINT SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12 (b)(5)

Not only does this Court lack *in personam* jurisdiction over Mr. Heyman, the Complaint

against Mr. Heyman was never properly served and should be dismissed for that reason as well.

To exercise personal jurisdiction over a defendant, the court must be satisfied that service of the

Complaint comports with the state's long-arm statute and the Due Process Clause of the

Fourteenth Amendment.  Noonan v. Winston Co., 902 F. Supp. 298, 302 (D. Mass. 1995), aff'd,

135 F.3d 85 (1st Cir. 1998).  See also Fed. R. Civ. P. 4(e) (1).  Massachusetts Rule 4(e) controls

out-of-state service and "embodies the procedure set out in the long-arm statute."  Reporters'

Notes to Mass. R. Civ. P. 4.  The Massachusetts long-arm statute, Mass. Gen. Laws ch. 223A, §

6(a), authorizes service of process "by any form of mail addressed to the person to be served,"

and § 6(b) provides that "(w)hen service is made by mail, proof of service shall include a receipt signed by the addressee or other evidence of personal delivery to the addressee satisfactory to the court." Service on Mr. Heyman was not made in accordance with the statute.

Plaintiff sought to serve Mr. Heyman by certified mail and requested a return receipt. Mr. Heyman did not sign for the mail; rather, it was sent to a mail room in a building and a State where Mr. Heyman does not work and was not present. See Heyman Aff., ¶¶4-5. No personal service upon Mr. Heyman occurred. Accordingly, Plaintiff did not comply with Mass. R. Civ. P. 4 and Fed. R. Civ. P. 4(e)(1) and the Complaint against Mr. Heyman should be dismissed pursuant to Fed. R. Civ. P. 12 (b)(5).

**IV.    THE COMPLAINT DOES NOT ASSERT A CAUSE OF ACTION AGAINST MR. HEYMAN AND SHOULD BE DISMISSED PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

Even if Mr. Heyman is subject to personal jurisdiction in a Massachusetts court and even if service of process was proper – which is not the case – the Complaint against Mr. Heyman should still be dismissed for failure to state a claim. A pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief can be granted. Peterson v. Atlanta Housing Auth., 998 F.2d 904, 912 (11th Cir. 1993) (Motion to dismiss granted where Complaint devoid of reference to any injury inflicted by defendant); Wilson v. Civil Town of Clayton, 834, F.2d 375, 378 (7th Cir. 1988) (same).

Moreover, conclusory allegations and legal conclusions masquerading as facts will not suffice to prevent a motion to dismiss. DM Research v. College of American Pathologists, 170 F.3d 53, 55-56 (1st Cir. 1999) (While plaintiff's facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, and legal conclusions); Sheridan v. Int'l Bhd. of Elec. Workers, 940 F. Supp. 368, 372 (D. Mass. 1996) (Deferential

reading of plaintiff's Complaint does not require court to credit "bald assertions" or "unsubstantiated conclusions").

Simply put, the plaintiff must allege a factual predicate concrete enough to warrant further proceedings. DM Research v. College of American Pathologists, 170 F.3d 53, 55-56 (1st Cir. 1999) ("The price of entry, even to discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further proceedings, which may be costly and burdensome. Conclusory allegations in a Complaint, if they stand alone, are a danger sign that the plaintiff is engaged in a fishing expedition").

Here, the facts plead in the Complaint, even with all inferences drawn in Plaintiff's favor, do not state a set of facts against Mr. Heyman which, if proved, add up to a valid cause of action. As set forth in the "Statement of Undisputed Facts," Mr. Heyman is mentioned in the Complaint solely in the caption and in paragraph 8(c). Aside from these references, the Complaint contains no facts related to Mr. Heyman, and does not allege that Mr. Heyman personally engaged in any conduct or personally participated in any of the activities plead against "GAF." Nor does Plaintiff demand any judgment against Mr. Heyman in the "Relief Requested" portion of the Complaint. Under these circumstances, Plaintiff's Complaint against Mr. Heyman should be dismissed. See In re Plantation Realty Trust, 232 B.R. 279, 282 (Bankr. D. Mass. 1999) (explaining that a corporation is separate and distinct from its shareholders and that "[w]ithout cause, a court cannot look beyond the corporation's legal structure and property to satisfy a judgment or to find legal accountability in others for actions taken in the corporate name").

## V.  ALL CLAIMS AGAINST DEFENDANTS GAF BUILDING MATERIALS CORPORATION AND GAF CORPORATION SHOULD BE DISMISSED PURSUANT TO THE AUTOMATIC STAY PROVISIONS OF 11 U.S.C.A. § 362(a)(1)

Even if Plaintiff's claims are not time-barred – and they are – the claims against GAF Building Materials Corporation and GAF Corporation still should be dismissed.  G-I Holdings Inc., the corporate successor to defendants GAF Building Materials Corporation and GAF Corporation, filed for bankruptcy on January 5, 2001.  Under 11 U.S.C.A. § 362(a)(1), the mere filing of the bankruptcy petition operates as an automatic stay of certain acts specified in that section.  See generally, In re Soares, 107 F.3d 969, 975 (1st Cir. 1997); Dimaio Family Pizza & Luncheonette v. The Charter Oak Fire Ins. Co., 349 F. Supp.2d 128, 131 (D. Mass. 2004).  That section provides:

> Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--
>
> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title....

11 U.S.C.A. § 362(a)(1).  The purpose of the automatic stay is "to give the debtor breathing room by stopping all collection efforts, all harassment, and all foreclosure actions."  In re Soares, supra, 107 F.3d at 975 (internal citations omitted).  In addition, the respite prevents creditors from "bringing different proceedings in different courts."  Id.  Proceedings in violation of the stay are void.  In re Smith Corset Shops, Inc., 696 F.2d 971, 976 (1st Cir. 1982).  Thus, the filing of the instant action against defendants GAF Building Materials Corporation and GAF Corporation (G-I Holdings Inc.) violates 11 U.S.C.A. § 362(a)(1), and all claims against

defendants GAF Building Materials Corporation and GAF Corporation are void and should be dismissed as a matter of law.

### Conclusion

Defendants BMCA and Samuel Heyman respectfully request that the Court grant their motion for summary judgment and motion to dismiss.

Respectfully submitted,

Building Materials Corporation of America

By its attorneys,

/s/ Jonathan Sablone

_____
Dennis M. Duggan, Jr., P.C. (BBO #137460)
Jonathan Sablone (BBO #632998)
Stephen M. LaRose (BBO #654507)
Nixon Peabody LLP
100 Summer Street
Boston, MA 02110
(617) 345-1000

**Of Counsel:**

**McCarter & English, LLP**
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, New Jersey 07101-0652
(973) 622-4444

Dated: July 15, 2005

### CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by first class mail, postage pre-paid, on July 15, 2005.

/s/ Jonathan Sablone

_____
Jonathan Sablone

BOS1510540.1

-19-

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

PETER GACICIA, individually and on behalf
of a class of similarly situated persons,

:
:
:
:

Plaintiffs,                           Civil Action No. 1:05-CV-11204-WGY

:
:

vs.

:
:

GAF BUILDING MATERIALS
CORPORATION, GAF CORP. AND
SAMUEL HEYMAN,

:
:
:
:
:

Defendants.

:
:

_____

**AFFIDAVIT OF JONATHAN SABLONE**

I, Jonathan Sablone, do on oath hereby depose and say:

1.   I am an attorney admitted to practice before the United States District Court for the District
of Massachusetts, and a partner at the law firm of Nixon Peabody LLP, attorneys of record
for Defendants Building Materials Corporation of America and Samuel Heyman. I submit
this Affidavit in support of the defendants' motion to dismiss, or, in the alternative, motion
for summary judgment.

2.   Attached hereto as Exhibit A is a true and correct copy of Plaintiffs' First Amended
Complaint in Coleman v. GAF Building Materials Corp., CV-96-0954-Galanos ("Coleman"),
filed in the Circuit Court of Mobile County, Alabama, on May 21, 1996.

3.   Attached hereto as Exhibit B is a true and correct copy of the transcript of the deposition of
Plaintiff Peter Gacicia, taken in the Commonwealth of Massachusetts on December 10, 1996,
pages 22, 23, 35, 36, 69, 70 and 89.

4.   Attached hereto as Exhibit C is a true and correct copy of a letter dated March 11, 1999 from
Plaintiff's attorney, Kenneth G. Gilman, Esq., exercising Plaintiff's right to opt-out of the
Coleman action.

-2-

5.  Attached hereto as Exhibit D is a true and correct copy of the Settlement Agreement, without attachments, in the <u>Coleman</u> action, dated September 24, 1998.  Also attached is the Amendment to the Settlement Agreement, dated February, 1999.

6.  Attached hereto as Exhibit E is a true and correct copy of the Order Approving the Class Notice Program, without attachments, in the <u>Coleman</u> action, dated November 2, 1998.

7.  Attached hereto as Exhibit F is a true and correct copy of the Final Order and Judgment in the <u>Coleman</u> action, dated April 16, 1999.

Signed under the pains and penalties of perjury this 15th day of July, 2005.

/s/ Jonathan Sablone

_____
Jonathan Sablone

# EXHIBIT A

062

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA



JOHN and PENNY COLEMAN and JEX R. and
ANN H. LUCE, JR. and EDWARD and LUCIAN S.
"POPPY" FIELDS, EDWARD R. DILLON and
JOCELYN EDELSTON, individually and on behalf
of a class of similarly situated persons,

Plaintiffs,

vs.

GAF BUILDING MATERIALS CORPORATION,

Defendant.

Civil Action Number:
CV-96-0954-Galanos

JURY TRIAL
DEMANDED

RECEIVED
MAY 21 1996
J. BERNSTEIN

FIRST AMENDED COMPLAINT

I.    NATURE OF THE ACTION

1.  This action is brought on behalf of a nationwide class composed of all individuals and entities who purchased GAF asphalt shingles or who currently own buildings or structures in the United States on which GAF Building Materials Corporation ("GAF") asphalt roofing shingles (hereinafter "GAF shingles") manufactured since January 1, 1979 have been installed, the classes being more specifically described in paragraph 39.

2.  Commencing at some time presently unknown to plaintiffs but believed to be in 1979 or soon thereafter and continuing to the present, GAF has knowingly manufactured, distributed, and falsely advertised millions of square feet of defectively designed and manufactured asphalt roofing shingles to roofing contractors and property owners throughout the United States. GAF failed to adequately design, formulate and test its GAF shingles before distributing them to the Plaintiffs and

the class, and has failed to remove them from the marketplace or take other remedial action after learning of their defective nature.

3.    GAF's shingles, manufactured during the class period set forth in paragraph 35, are uniformly defective and, when exposed to normal climatic conditions, prematurely split, crack, curl, buckle, develop seal down problems and otherwise deteriorate. The shingles owned by plaintiffs and class members either already have manifested these defects (thereby causing damages such as the cost of removing and replacing the defective shingles) or will manifest these defects prior to the expiration of the applicable written warranty given by GAF. The premature splitting, cracking, curling, buckling and blow-offs of GAF shingles occur at a rate extraordinarily higher than that of other commonly used and non-defective shingles.

4.    GAF has concealed material facts concerning the uniformly defective characteristics of its shingles from the public and has nonetheless continued to market and sell GAF shingles to the public and concealed the existence of thousands of customer claims and complaints regarding the GAF shingle problems.

## II.    JURISDICTION

5.    Plaintiffs seek damages on behalf of themselves and all others similarly-situated under the common and statutory laws of the State of Alabama, and the similar statutory and common laws in effect elsewhere in the United States.    In particular, this Court has jurisdiction over the claims for breach of written or implied warranty (as defined in 15 U.S.C. §§ 2301(6) and (7)) under 15 U.S.C. § 2310 (d)(1)(A), because GAF shingles are a "consumer product," as defined in the Magnuson-Moss Consumer Product Warranty Act ("the Act"), 15 U.S.C. § 2301(1), and because defendant is a

2

063

"supplier" and "warrantor" under 15 U.S.C. §§ 2301(4) and (5). Alternatively, this Court has jurisdiction over the breach of written and implied warranty claims directly under § 2-314(2)(c) of the Uniform Commercial Code ("UCC") adopted by 49 other states (excepting those states that required vertical privity) and the District of Columbia and under La. Civ. Code Art. 2503, 2520 and 2531. This Court also has jurisdiction under the substantively similar unfair or deceptive trade practices statutes of the states included in the Deceptive Trade Practices Subclass as described in paragraph 36(c). The aggregate amount in controversy is in the millions of dollars classwide and is typically several thousand dollars for each plaintiff and individual class member. The individual representative plaintiffs' damages are less than $50,000 each, exclusive of interest and costs. The individual representative plaintiffs do not seek damages greater than $50,000 each. Neither punitive damages nor a statutory award of attorney's fees is sought herein.

III.    VENUE

6.    GAF has during the class period conducted business in this County and State and throughout the United States by manufacturing, selling, marketing, and warranting the shingles at issue in this case. GAF operates a manufacturing plant located in Mobile, Alabama.

IV.    THE PARTIES

(A)    THE PLAINTIFFS

7.    Plaintiffs John and Penny Coleman ("the Colemans") reside at 251 Charles Street, in Mobile, Mobile County, Alabama. In approximately February of 1980, the Colemans through their building contractor purchased Timberline® asphalt shingles with a 25 year guarantee manufactured by defendant GAF. Subsequently in May or June of 1994 and within GAF's 25-year written

3

065

4

warranty, substantial portions of the shingles had deteriorated badly and the roof had begun to leak, requiring the Colemans to incur actual replacement costs of less than $10,000.

8. Plaintiffs Jex R. and Ann H. Luce, Jr. ("the Luces") reside at 217 Lanier Avenue in Mobile, Mobile County, Alabama. In approximately January of 1980, the Luces through their roofing contractor purchased GAF Timberline® asphalt shingles with a 25 year guarantee. Subsequently in 1992 and within GAF's 25-year written warranty, substantial portions of the shingles had deteriorated badly and the roof had begun to leak, requiring the Luces to incur replacement costs of approximately $2,000.

9. Plaintiffs Edward and Lucian S (Poppy) Fields (the "Fields") reside at 51 Williams Court, Mobile, Mobile County, Alabama. In approximately September of 1981, the Fields through their roofing contractor purchased GAF Timberline® asphalt shingles with a 25 year guarantee. Subsequently in 1991 and within GAF's 25-year written warranty, substantial portions of the shingles had deteriorated badly. The deteriorating shingles are still on the Fields's home. The Field's estimate that it will cost them less than $10,000 to replace their roof.

10. Plaintiff Edward R. Dillon is a resident of Saddle Brook, Bergen County, New Jersey. In April of 1995, Mr. Dillon purchased GAF Royal Sovereign fiberglass based asphalt roofing shingles with a 25 year guarantee and installed the GAF shingles on his residence. It is estimated that it will cost Mr. Dillon less than $10,000 to replace the defective shingles.

11. Plaintiff, Jocelyn Eddelston is a resident of Gloucester, Essex County, Commonwealth of Massachusetts. Ms. Eddelston purchased a residence on which GAF Sentinel fiberglass based asphalt roofing shingles were installed in 1987. The GAF Sentinel shingles had a 20 year warranty.

990

Subsequently, by 1994, substantial portions of the shingles had split, cracked and failed. Ms. Eddison estimates that it will cost less than $5,000. to replace the shingles.

**(B) DEFENDANTS**

12. GAF Building Materials Corporation is a Delaware corporation headquartered in Wayne, New Jersey. GAF has a plant in Mobile County and some of the shingles which are the subject of this action were manufactured here. GAF has manufactured and sold asphalt shingles throughout the United States for over fifty (50) years.

**V. FACTUAL ALLEGATIONS**

13. Throughout the Class Period, GAF has knowingly manufactured, distributed, warranted, and falsely advertised and marketed defective GAF asphalt shingles that have been applied to the roofs of property owned by the Plaintiffs and Class Members. GAF marketed its products under the brand names "Standard Self-Sealing", "Nor'easter", "Dubl-Coverage Tite On", "Sentinel", "Suburban", "Sovereign", "Royal Sovereign", "Slateline", and "Timberline" (hereinafter collectively "GAF shingles").

14. Throughout the Class Period, GAF failed to adequately manufacture, formulate, and test the GAF shingles before marketing them to the named Plaintiffs and the Class as a durable and suitable exterior roofing product. GAF has advertised, sold, and distributed to plaintiffs and class members the GAF shingles that they knew or should reasonably have known were defectively designed and manufactured. Furthermore, GAF failed to remove its GAF shingles from the marketplace or to take other remedial action after it knew of the inherent defects of its GAF shingles.

5

15. GAF's asphalt shingles prematurely split, crack, curl, buckle, discolor, deteriorate and blow-off (which in turn may cause damage to other structural parts of the class's residences and/or buildings), and otherwise fail to perform as represented and expressly or impliedly warranted, and/or do not perform in accordance with the reasonable expectations of plaintiffs and class members that such shingles are durable, strong, or superior to other conventional non-defective shingles and are easy to install on personal residences and other realty. Due to GAF's superior knowledge and the latency of the defects, GAF had a duty to the public to disclose the defective nature of the GAF shingles and to not conceal and suppress their defective nature from the plaintiffs.

16. Throughout the Class Period, the Defendant GAF engaged in a course of conduct to manufacture and distribute and knowingly make or publish false public statements about GAF shingles, which was intended to and did deceive the public and the building industry as to the strength, durability, effectiveness and other properties of GAF shingles. Contrary to the Defendant's representations concerning GAF shingles, they were defectively designed and manufactured and were not, for the reasons stated below, fit for the purposes for which they were to be used.

17. GAF promoted and advertised its asphalt roofing shingles to the named Plaintiffs and the Class in national consumer and trade magazines and publications representing that its shingles were superior to other conventional shingles; strong with long term performance; and so durable that they are warranted for 15 years or more to remain free of manufacturing defects for their applicable warranty period. Exhibit A attached hereto is a true and correct copy of GAF's standard form limited warranty for asphalt shingles.

6

067

. . . .ublication entitled "Shingles Don't Have To Be Organic To

890

18.    For instance, in GAF's publication entitled "Shing... 'Don't  'e To Be Organic To

Be The Natural Choice", published during the Class Period as defined below, GAF placed the

following advertisement for its shingle products, which is typical of GAF's representations in its

national publications since 1979 concerning the durability and strength of GAF shingles.

When you consider durability, strength, and handling, today's organic shingles can't
compare to fiberglass. Today's fiberglass shingles contain a combination of glass mat,
water resistant asphalt and ceramic-coated granules. This combination makes the old
industry standard, organic shingle (for many years the only choice), no longer "the
shingle of choice". Since a shingle is only as good as the base it is built on, the heart
of every GAF Building Materials Corporation fiberglass asphalt shingle is fiberglass
mat. On the other-hand organic felts, the base for organic shingles, are made of waste
paper and wood by-products, which can result in a less consistent shingle. As a
result, organic shingles can not be expected to perform as well as fiberglass under
adverse conditions such as rain, sleet, ice, snow and harsh winds. Shingles using
organic felt are susceptible to moisture attack and can also blister, curl and buckle.
Another big advantage — GAF BMC manufactures glass fibers and glass mats. This
allows us total quality control in the manufacturing process. As a result GAF BMC
fiberglass shingles have a consistency in quality not offered by shingles made with
organic felts....

19.    GAF's representations referred to in paragraphs 17 and 18 were false and were either

made by GAF with knowledge that they were false or with reckless indifference to the truth. GAF

intended for these representations to reach the plaintiffs and the Class and for the plaintiff class to rely

upon these representations when purchasing suitable shingles for use in roofing their home or other

buildings or in purchasing a home in which GAF shingles had been installed. GAF was in a superior

position to know the true facts of the hidden defects of its shingles and its known repercussions based

on information that GAF had or was aware of. GAF knew or should have known of the potential

damage to consumers, and GAF therefore owed a duty to disclose the fact of the concealed defect

to plaintiffs and the class members. These uniform and written representations resulted in increased

7

690

sales of GAF shingles. All of the above stated representations were uniformly made to all the class members and to the public at large.

20.     At all times prior to and during the period GAF manufactured and sold its shingles to the public, GAF knew that tear strength and resistance are critical performance characteristics, in relation to and in determining resistance of its shingles to splitting, cracking, tearing, wind loads and "blow-off".

21.     At all times prior to and during the period GAF manufactured and sold its shingles to the public, GAF also knew, that to resist cracking, its shingles had to have sufficient mechanical integrity and toughness to resist normal stresses that are applied to the shingles on the roof.

22.     Commencing on a date unknown to Plaintiffs but believed to be in 1979 or soon thereafter, GAF manufactured, marketed and sold organic based asphalt shingles to the public, including but not limited to the brands Dubl-Coverage Tile On, Nor'easter and Timberline.

23.     At all times prior to and during the Class Period when GAF manufactured and sold organic shingles to the public, including its Dubl-Coverage Tile On, Nor'easter and Timberline brands, GAF knew that its organic shingle products:

a.     absorbed moisture;

b.     changed dimensions as a result of swelling of the individual fibers;

c.     were not manufactured properly and their organic felt mats (made of waste paper and wood by-products) were not adequately saturated with quality asphalts; and

d.     were defective and blistered, curled and buckled.

e.     failed to comply with ASTM D225.

8

070

24.    GAF ceased manufacturing and marketing its defective organic shingles in 1984.

25.    Commencing on a date unknown to Plaintiffs but believed to be in 1979 or soon thereafter, GAF manufactured, marketed and sold fiberglass based asphalt shingles to the public, including but not limited to the brands Standard Self-Sealing, Nor'easter, Dubl Coverage Tite On, Sentinel, Suburban, Sovereign, Royal Sovereign, Slateline, GAF Wood Line, Timberline and Timberline Ultra.

26.    At all times prior to and during the class period and during the period GAF manufactured and sold its shingles to the public, including from 1979 through the present date, GAF knew that its fiber glass based asphalt shingles:

a.    did not have adequate tear strength and resistance;

b.    failed to comply with even the minimum tear strength requirements specified in ASTM D-3462 entitled Standard Specification for Asphalt Shingles Made From Glass Felt and Surfaced With Mineral Granules;

c.    did not have a sufficiently strong heavyweight reinforcement mat and therefore did not promote adequate tear resistance, tensile strength, fastener pull-through resistance and flexibility.

d.    did not contain an appropriate level or quantity of loading or mineral stabilizer in the coating asphalt which thereby reduced the durability and pliability of the shingle and increased the stiffness of the shingle;

e.    were not manufactured with durable, pliable and quality asphalts;

6

071

f.      were designed and manufactured with a sealant bond which material is excessively rigid and fails to remain flexible and pliable and was not compatible with the low tear resistance of GAF shingles.

27.   GAF gave to plaintiffs and class members a long term written warranty (15 or more years), without telling the class that the shingles would prematurely fail prior to the expiration of the applicable warranty, giving the plaintiffs the false impression that the product was not defective and would not begin to deteriorate only a few years after installation. Further, GAF unconscionably has attempted to exclude the warranty of merchantability because of GAF's failure to disclose that the shingles are defective and not durable or suitable for use, because plaintiffs do not have an opportunity to bargain over the terms of the limited warranty, because the defect is latent and is not discoverable at the time of purchase but instead years later, and because the remedy left to the named Plaintiffs and the class is inadequate and does not meet minimum standards as required by UCC § 2-719 in that the remedy is unconscionable and fails of its essential purpose, in that GAF has refused to honor the warranty and pay the full amount and because the remedy provided is completely inadequate since, the shingles cannot be properly repaired without removing them and installing an entirely different product at a cost in excess of the original purchase price. Since the limitations on remedies and the exclusion of the implied warranty of merchantability (that the shingles are a suitable product in the industry for installation on homes) are unlawful and unconscionable, GAF is obligated to the named Plaintiffs and the class for breach of that warranty and is responsible for the consequential damages that named Plaintiffs and the class have incurred.

10

072

28.  GAF engaged in a scheme to cover up the true nature of the problems with its shingles. GAF has consistently denied the claims made under its warranty, and GAF has consistently blamed the problems upon the contractor, builder or property owner for allegedly faulty installation or maintenance. Alternatively, GAF, while blaming the contractor or builder and/or owner, would offer some minor assistance that was a very limited portion of its obligation under the written warranty, leaving the owner to bear the remaining cost of replacing the defective shingles. GAF has concealed and suppressed from the plaintiffs and class members that the real problem with the shingles, regardless of the manner of installation, is the defective manufacture of GAF's product.

29.  To this day GAF continues in this pattern of concealment and suppression by deliberately and knowingly misrepresenting to the plaintiffs and class members the true nature of the problem. In fact, the vast majority of the plaintiff class is still unaware that GAF shingles have and will continue to prematurely fail due to their defective nature.

30.  Plaintiffs are particularly vulnerable to such fraudulent and deceptive practices because they are anxious to protect their homes as best as they can and because of the financial burden imposed upon them to correct the problem.

31.  At the time of their sale GAF knew or should have known that GAF shingles were defectively manufactured and that they would split, crack, curl, buckle, discolor and deteriorate, and cause damage to other structural parts of residences, and otherwise not perform as expressly represented and warranted. GAF knew or should have known that these problems were not the result of improper installation, and that regardless of how the shingles were installed, they would not perform in accordance with the reasonable expectations of plaintiffs and class members. On

11

073

information and belief, GAF had actual knowledge before and at the time of sale of various reports and studies that were not known to the public but which concluded that the asphalt shingles GAF was manufacturing and selling would fail prematurely due to manufacturing and design defects.

32. In particular, but without limitation, GAF

(a)   Fraudulently and conspiratorially withheld crucial technical and performance information from thousands of builders, roofers and property owners in the United States relating to the failure rate and characteristics of its asphalt shingles as revealed by both testing of the GAF shingles and the numerous complaints lodged with GAF relating to premature failure, discoloration, cracking, and buckling which were occurring throughout the nation;

(b)   Fraudulently and conspiratorially denied any knowledge of any inherent design or manufacturing flaws in its asphalt shingles, despite having actual or constructive knowledge of serious design, manufacturing, and chemical formulation deficiencies of the GAF shingles which were proximately resulting in the premature failure problems complained of throughout the nation;

(c)   Fraudulently and conspiratorially represented and blamed all failures, discoloration, cracking and buckling problems upon improper installation or maintenance, despite having actual or constructive knowledge of serious design, manufacturing, and chemical deficiencies that were inherent in its shingles which were, to the knowledge of GAF, the most probable explanation of the premature failure, discoloration, cracking and buckling problems complained of throughout the nation.

33. GAF has continued to intentionally conceal and misinform the public as to the defective nature of the GAF shingles and has refused and failed to take the necessary corrective measures to

12

074

remedy the defective product. Due to its superior knowledge of the defects in its shingles, GAF had a duty to disclose to the public the defective nature of the shingles and not to conceal and suppress their defective nature. Despite this duty, GAF has continued to represent to the public that its asphalt shingles are particularly appropriate for use on the roofs of homes and other real property of the named Plaintiffs and the class.

34. To this day GAF refuses to disclose to the public, including plaintiffs and class members, that its asphalt shingles split, crack, curl, buckle and fail when exposed to normal climatic conditions that exist throughout the United States. In fact, many in the plaintiff class are still unaware that GAF shingles have and will continue to prematurely fail due to the defective nature of the manufacturing process, and as a result many class members have replaced the deteriorated shingles with more of the same defective shingles.

35. GAF has had ample motive to actively conceal the defective nature of GAF shingles because asphalt shingles have been an important contributor to its profits. GAF produces millions of square feet of shingles each year, representing millions of dollars in sales.

36. The inherent defects in asphalt shingles are latent and self-concealing, especially for homeowners. Even in the exercise of reasonable care, the named Plaintiffs and class members simply cannot discover that such inherent defects exist, and have no way of determining who is responsible for resultant damage. By suppressing the dissemination of information regarding the vulnerability of its shingles to climatic conditions, GAF has intentionally foreclosed Plaintiffs and class members from learning of GAF shingles' latent defects and from pursuing claims against GAF.

13

075

37. By reason of the foregoing, the claims of Plaintiffs and class members are timely under any applicable statute of limitations (as tolled by the filing of this complaint) pursuant to the discovery rule and the doctrines of fraudulent concealment and equitable tolling.

VI. CLASS ACTION ALLEGATIONS

(A) *The Proposed Classes:*

38. This action is brought and may properly be maintained as a class action pursuant to Rule 23(1)-(4) and (b)(3) of the Alabama Rules of Civil Procedure on behalf of Plaintiffs and all others similarly situated who purchased GAF shingles or who currently own a building on which shingles were attached between January 1, 1979 and until the date of final judgment herein or expiration of GAF's applicable written warranty.

39. Plaintiffs bring this action on their own behalf and in a representative capacity on behalf of a Class consisting of the following four Subclasses defined according to the legal claims asserted. Most members of the overall Class are members of two or more of the four proposed Subclasses.

(a) IMPLIED WARRANTY SUBCLASS

All persons who purchased GAF shingles or who currently own buildings on which GAF's asphalt shingles were or are attached, which shingles (1) have already or by the time of final judgment herein split, crack, curl, buckle, blow-off, deteriorate or fail or (2) will split, crack, curl, buckle, blow-off, deteriorate or fail prior to expiration of the applicable GAF written warranty, and who have notified GAF of the breach either individually or through the classwide notice of breach which this Complaint constitutes under 15 U.S.C. § 2310(e) and/or UCC § 2-607(3)(a), with this breach of

14

076

implied warranty of merchantability claim asserted under 15 U.S.C. § 2310(d)(1) or alternatively, to any extent that the Magnuson-Moss Act is found inapplicable, under UCC § 2-314(2)(c).

Excluded from this Subclass are:

(1) personal injury claims;

(2) persons who prior to the filing of this Complaint or prior to final judgment herein have filed separate nonclass legal actions against GAF asserting similar claims;

(3) GAF, including any parent, subsidiary, affiliate, or controlled person of such defendant and its officers, directors, agents, or employees and members of their immediate families; and

(4) persons with claims in excess of $50,000.

(5) purchasers in states that at the time of final judgment herein require vertical privity to pursue implied warranty claims, such states presently including, e.g., Alabama, Arizona, New York, Florida, Connecticut, Wisconsin, Kentucky, Indiana, Washington, Iowa, and Utah (as to all owners) or California, Georgia, Illinois, North Carolina, Ohio, Oregon, and Texas (as to owners who were not the original purchasers of GAF's asphalt shingles and/or the property to which it was attached);

and

(6) purchasers other than "consumers" in Kansas.

The jurisdictions (including the District of Columbia) encompassed by the Implied Warranty Subclass are hereinafter referred to as the "Implied Warranty States".

### (b)  WRITTEN WARRANTY SUBCLASS

All persons who purchased GAF's asphalt shingles for their home, whose shingles (1) have already or by the time of final judgment herein split, crack, curl, buckle, blow-off, deteriorate or fail

15

077

or (2) will split, crack, curl, buckle, blow-off, deteriorate or fail prior to expiration of the applicable GAF written warranty, and who have notified GAF of the breach either individually or through the classwide notice of breach which this Complaint constitutes under 15 U.S.C. § 2310(e) and/or UCC § 2-607(3)(a), with this breach of written warranty claim asserted under 15 U.S.C. § 2310(d)(1) or alternatively, to any extent that the Magnuson-Moss Act is found inapplicable, under UCC § 2-313.

Excluded from this Subclass are:

(1) the first four groups excluded from the Implied Warranty Subclass;

(2) any persons who have already replaced their rotted or deteriorated shingles without first having given written notification to GAF as required by the terms of GAF's written warranty.

## (c) DECEPTIVE TRADE PRACTICES SUBCLASS

All persons who purchased GAF shingles or who currently own buildings on which GAF's asphalt shingles were or are attached, whose shingles (1) have already or by the time of final judgment herein split, crack, curl, buckle, blow-off, deteriorate or fail or (2) will split, crack, curl, buckle, blow-off, deteriorate or fail prior to expiration of the applicable GAF written warranty term, with this claim asserted under the substantively similar state statutes that either (1) prohibit unfair or deceptive trade practices generally (e.g., Alaska, Connecticut, Florida, Georgia, Hawaii, Kentucky, Louisiana, Maine, Massachusetts, Missouri, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, Ohio, Rhode Island, South Carolina, Tennessee, Texas, Vermont, Washington, West Virginia, Wyoming, Arizona, Delaware, Illinois, Iowa, New Jersey, and North Dakota) and/or (2) prohibit included but more specifically defined conduct such as representing that goods have characteristics, uses, benefits, or qualities that they do not have or that goods are of a particular

16

078

standard, quality, or grade if they are of another (e.g., California, District of Columbia, Idaho, Maryland, Michigan, Minnesota, Mississippi, Pennsylvania, and Virginia), including the following additional subgroups: (A) those states that require a showing of scienter (e.g., Arkansas, Colorado, Kansas, Nevada, Oklahoma, Oregon, South Dakota, Utah, and Wyoming), (B) those states that require the showing of some "aggravating factor" other than scienter (e.g., North Carolina and New Jersey), and (C) those states that require proof of reliance, whether or not classwide reliance can be rebuttably presumed (e.g., Arizona, Georgia, and Wyoming).

Excluded from this Subclass are:

(1) the first four groups excluded from the Implied Warranty Subclass;

(2) persons who purchased property to which GAF's shingles were already affixed in states whose deceptive trade practices statutes do not cover "fixtures" (e.g., Florida prior to June 30, 1993 and Indiana);

(3) persons other than "consumers" in states whose deceptive trade practices statutes are limited to consumers who purchase for personal, family, or household purposes (e.g., California, District of Columbia, Georgia, Hawaii, Kansas, Maine, Maryland, Michigan, Mississippi, Missouri, Montana, Ohio, Oregon, Pennsylvania, Rhode Island, Tennessee, Utah, Virginia, and Wyoming);

(4) persons whose claims would be time-barred under state deceptive trade practices statutes or other limitations doctrines that have repose provisions not permitting tolling of the limitations period due to fraudulent concealment, such as one year from discovery but no more than four years from transaction (e.g., Louisiana, Tennessee, New Hampshire, Ohio, and Wyoming); and

(5) residents of Alabama, pursuant to Ala. Code § 8-19-10(f).

17

079

The jurisdictions (including the District of Columbia) encompassed by the Deceptive Trade Practices Subclass are hereinafter referred to as the "Deceptive Trade Practices States".

### (d) FRAUD SUBCLASS

All persons who purchased GAF shingles or who currently own buildings or real property located in Alabama, Florida, and/or Indiana to which GAF shingles were or are attached, and whose shingles (1) have already or by the time of final judgment herein split, crack, curl, buckle, blow-off, deteriorate or fail or (2) will split, crack, curl, buckle, blow-off, deteriorate or fail prior to expiration of the applicable GAF written warranty term. Alabama, Florida and Indiana are hereinafter referred to collectively as the "Fraud States." Excluded from this Subclass are the first four groups excluded from the Implied Warranty Subclass.

40. *Numerosity.* The members of the proposed Subclasses, being geographically disbursed throughout the United States and numbering in the hundreds of thousands, are so numerous that joinder of all of them is impracticable.

41. *Typicality.* Plaintiffs' claims are typical of class members' claims because each plaintiff has experienced splitting, cracking or deterioration of his or her shingles or will do so before expiration of the applicable GAF written warranty term, and by proving their own claims, plaintiffs will presumptively prove the claims of all class members.

42. *Adequacy of Representation.* Plaintiffs can and will fairly and adequately represent and protect the interests of the class and have no interests that conflict with or are antagonistic to the interests of class members. Plaintiffs have retained attorneys competent and experienced in class action and consumer defective products law and litigation. No conflict exists between plaintiffs and

18

080

19

class members because (a) the claims of the named plaintiffs are typical of the absent members' claims, (b) virtually all of the questions of law or fact at the liability stage are common to the class and overwhelmingly predominate over any individual issues, such that by prevailing on their own claims, plaintiffs necessarily will establish GAF's liability as to all class members, (c) without the representation provided by plaintiffs herein, virtually no class members will receive legal representation or redress for their injuries, (d) plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action, and (e) plaintiffs are aware of their fiduciary responsibilities to the class members and are determined diligently to discharge those duties.

43.   *Common Questions of Law.*  Virtually all of the issues of law in this class action are common to the proposed subclasses and include at least the following:

(a)  *Privity.*  None of the Implied Warranty Subclass members (who could not and did not purchase their GAF shingles directly from GAF) are barred from recovery by any lack of vertical privity required by state law for such claims, because that Subclass has been defined to exclude purchasers in such privity states (*see* ¶ 39(a)(5) *supra*).

(b)  *Fitness for Ordinary Purposes.*  The ordinary purposes of GAF shingles include keeping moisture, heat and cold, wind, and other elements out of the house.  Under the implied warranty law of each Implied Warranty State, a jury could determine as a matter of *fact* that the premature deterioration of GAF's shingles already experienced or to be experienced by all Implied Warranty Subclass members rendered or will render those shingles unfit for the ordinary purposes for which GAF shingles are used.  Under no such state law or legal interpretation would it be necessary for the jury to find or identify *specific* materials, components, or other design "defects" as the *particular*

081

*cause* of these defective shingles. Rather, state law is unanimous that classwide causation can be established by the fact that GAF shingles did not perform as warranted and that such failure was presumptively caused by GAF, e.g., by statistical evidence showing that these shingles failed at an extraordinarily high rate when compared with the failure rates of other nondefective shingles.

(c) *Affirmative Defenses.* Because the deterioration of class members' GAF shingles will be presumptively shown at the first stage of a bifurcated classwide trial to have been caused by the inherently defective nature of GAF's shingles, any state law affirmative defenses asserted against any individual class member claimants at the second stage (most likely for improper installation or maintenance, whether labeled "product misuse", "contributory negligence", "unintended usage", or "failure to follow instructions") will start with a heavy burden on GAF to rebut the powerful classwide presumption already established. The only potential material variation in state laws governing individual affirmative defenses to liability if the second stage is reached would be that some states recognize contributory negligence as a complete bar to recover, while most other states recognize various forms of comparative fault. These two standards are not in conflict, in that any challenged claimants from contributory negligence states would be subject to a single second-stage jury determination (i.e., if found to be contributorily negligent they do not recover), while claimants from comparative negligence states would have that jury determine (1) whether the claimant was contributorily negligent (if not, the inquiry is over) and (2) if so, by what percentage. Moreover, were it necessary to maintain commonality of legal standards here, plaintiffs could obviate this "variation" by stipulating to a single pro-defense contributory negligence standard.

20

082

(d) *Notice of Breach.* With respect to the Implied Warranty Subclass, 15 U.S.C. § 2310(e) provides for a single classwide notice of breach and opportunity to cure (which need not be given until after class certification), and that provision supplants any separate requirements under state law (e.g., UCC § 2-607(3)(a)) that class members separately and individually notify GAF of the warranty breaches alleged herein. Soon after the filing of this Complaint, plaintiffs will have given GAF such classwide § 2310(e) notice of breach. To any extent that 15 U.S.C. § 2310(e) is not dispositive of state law individual notice of breach requirements, classwide UCC § 2-607(3)(a) notice of breach has also been given to defendant both by plaintiffs and by thousands of complaints over the years from individual class members. Moreover, the law of each Implied Warranty State treats the timeliness of such notice as a question of fact, permitting the jury to find on a classwide basis that no consumer class member's failure to give such notice prior to the filing of this or earlier class action Complaints was unreasonably dilatory, given evidence of GAF's fraudulent concealment of its legal responsibility for its defective shingles and the inability of class members acting with due diligence to discover this cause of action against GAF from information generally accessible in the public domain until within one year prior to the filing of this or any earlier class action Complaint. Pursuant to Ala. Code § 8-19-10(e), Cal. Civ. Code § 1782(c), Ga. Code Ann. § 10-1-399(b), Me. Rev. Stat. tit. 5 § 213.1-A, Mass. Gen. Laws ch. 93A § 9(3), and Tex. Bus. & Com. Code § 17.505, plaintiffs have also contemporaneously with the filing of this Complaint given GAF the notice and demand required by those statutes on behalf of the members of the Deceptive Trade Practices Subclass from those states. Upon the expiration of the pre-complaint notice period prescribed by those statutes (e.g., thirty (30)

21

083

22

days), plaintiffs will file an Amended Complaint reasserting those states' Deceptive Trade Practices

Subclass claims.

(e) *Compensatory Damage Measure.* Under each included state's law, the out-of-pocket cost of repair or replacement (materials and labor) of the property damage caused by the deterioration of GAF's shingles, plus prejudgment interest, is a proper measure of "difference in value" breach of warranty compensatory damages (UCC §§ 2-714 and 2-715) and for recovery by members of the Deceptive Trade Practices Subclass.

(f) *Deceptive Trade Practices Subclass.* As described in the Subclass Definition (¶ 36(c)), the deceptive trade practices claims of all Subclass members are based on the same legal standard-- either that (1) the state statute generally prohibits unfair or deceptive trade practices or (2) prohibits representations that GAF shingles have characteristics, uses, benefits, or qualities or meets a particular grade or standard which it does not (which prohibitions would also be encompassed by the general prohibitions of the first group of states). Only three small subgroups have been carved out of this Subclass as a manageable number of sub-subclasses, for which any required additional proofs will necessarily be established by other classwide proofs in this case even if these three sub-subclasses were not included. These are (A) nine states having scienter requirements, but this is also a classwide issue regarding GAF's knowledge which will necessarily be proven for all class members as to the fraudulent concealment and unconscionable implied warranty disclaimer allegations; (B) two states that require some "aggravating factor" in addition to simple or even intentional breach of contract/warranty, a test that will also necessarily be satisfied by classwide proof of GAF's knowing classwide scheme and/or conduct violating other consumer rights; and © three states that may require

a showing of class members' reliance on GAF's material representations or omissions, but such reliance will be presumptively established on a classwide basis from the obvious materiality of the misrepresentations or from the failure to disclose material facts.

(g) *Class Action Prohibitions.* Certain state law prohibitions of class action remedies in their own state courts (e.g., Ala. Code § 8-19-10(f), Ga. Code Ann. § 10-1-399, Miss. Code § 75-24-15(3), Mont. Code Ann. § 30-13-133(1), and S.C. Code Ann. § 39-5-140(c)) are either procedural and therefore overridden by this Court's class action rule or they are substantive and require exclusion of those states from the Deceptive Trade Practices Subclass, as Alabama has already been so excluded.

(h) *Notice.* Plaintiffs will after class certification propose and implement a plan of individual and publication notice of class action pendency that under the due process and full faith and credit clauses as interpreted by the United States Supreme Court in *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985), will bind all out-of-state class members to the jurisdiction of this Court.

44. *Common Questions of Fact.* The vast bulk of the possible issues of fact to be determined in this class action, including all questions of fact to be determined at the initial classwide liability stage of this bifurcated proceeding, are common to the claims of all class members, including:

(a) *High Classwide Failure Rates and Classwide Causation.* Not only did these incidents of deteriorating GAF shingles render GAF's shingles unfit for their ordinary purposes (Implied Warranty Subclass) and not having the characteristics, uses, or benefits impliedly or expressly represented (Deceptive Trade Practices Subclass), but the frequency of these failures was so much higher than that experienced by other nondefective shingles as to presumptively establish classwide causation as

23

085

to all claims. Given the extraordinarily higher failure rate for defendant's shingles, the likelihood is *de minimis* that any given class member's deteriorated shingles were caused by improper installation or owner maintenance, because such intervening causes would only be consistent with defendant's shingle products having approximately the same failure rate as other nondefective shingles types, which typically are installed by similar contractors and roofers and maintained by similar home or other realty owners.

(b) *Fraudulent Concealment*. Defendant's actual or imputed discovery of the defective nature of their shingles, and defendant's active and knowing concealment of such information from the Subclasses, operated on a classwide basis.

(c) *Inability to Discover*. As a result of defendant's concealment since early on in their marketing of these shingles products, and because no significant revelatory information was obtainable with reasonable effort from the public domain, no class members acting with due diligence could have reasonably discovered information leading them to find good legal cause for the claims asserted herein earlier than one year prior to the filing of this or earlier class action Complaints asserting similar claims.

(d) *Reckless Disregard and Unconscionability*. Defendant's knowing manufacture, marketing, and sale of the subject shingles to class members with concealment of the high failure rate of such products was unconscionable and independently tortious conduct in reckless disregard of the legal rights of all class members.

45. *Superiority*. A class action is superior to any other available method for the fair and efficient adjudication of this controversy, given that (a) common questions of law and fact

24

980

overwhelmingly predominate over any individual questions that may arise, such that there would be enormous economies to the courts and the parties in litigating the common issues on a classwide instead of a repetitive individual basis, (b) the size of each class member's individual property damage claim, typically a few thousand dollars, is too small to make individual litigation an economically viable alternative, such that few class members have any interest in individually controlling the prosecution of separate actions (any that do may opt out, and the class definition excludes persons who have already or will before judgment file individual actions), © class treatment is required for optimal deterrence and compensation, (d) despite the relatively small size of individual class members' claims, their aggregate volume, coupled with the economies of scale inherent in litigating similar claims on a common basis, will enable this case to be litigated as a class action on a cost-effective basis, especially when compared with repetitive individual litigations, and (e) no unusual difficulties are likely to be encountered in the management of this class action, in that (1) all questions of law or fact to be litigated at the liability stage are common to the class, (2) if plaintiffs do not prevail at the classwide liability stage, the litigation in the trial court will be terminated, and (3) if plaintiffs do prevail at the liability stage, the parties may be able to reach a classwide settlement, thereby obviating any need for second stage individual proceedings on damages and any affirmative defenses raised as to some individual class member claimants.

## COUNT I
### (Fraud by Nondisclosure)
### (Alabama, Florida, and Indiana)

46. Plaintiffs, on behalf of themselves and all others similarly situated, reallege as if fully set forth each and every allegation contained in the preceding paragraphs, and further allege that GAF's

25

087

26

direct and indirect representations through national advertising and product information appearing in consumer and professional magazines regarding the durability of and the quality of GAF shingles like those set forth herein in paragraph 18 were false and misleading, were material facts, were made willfully to deceive, or recklessly without knowledge, or were made by mistake or innocently, and were acted on by plaintiffs to their substantial detriment and injury.

47.    GAF's representations as set forth above regarding the durability, quality, and characteristics of the shingles were willful or reckless misrepresentations of material fact made with the intent to induce plaintiffs to act thereon and plaintiffs did, without knowledge of their falsity, directly or indirectly, justifiably act upon those willful misrepresentations to their injury, as evidenced by their purchase of GAF's shingles or purchase of property on which it was installed.

48.    GAF either knew or should have known since the early 1980's (the exact time is presently unknown to plaintiffs) that its shingles were defectively manufactured and subject to premature failure and splitting, cracking, curling, buckling, deterioration and blow-off and were otherwise not as it was represented or warranted to be by GAF as was alleged above.

49.    GAF was under a duty to disclose this information to the plaintiffs under laws requiring it not to engage in false and deceptive trade practices and because GAF was in a superior position to know the true state of the facts about the hidden defect and its known repercussions to the plaintiffs upon purchase and installation, because the defect was latent and would not appear for several months or years, and because of the special circumstances associated with the use of the product on plaintiffs' homes and residences. As a result of GAF's fraud and suppression of material

880

facts, the plaintiffs acted to their detriment in purchasing the defective shingles or homes on which they were installed, which they would not have purchased had they been told the truth.

50. As a result of GAF's practices, plaintiffs and class members have suffered actual damages in that they have purchased and installed on homes and buildings roofing shingles that are defective and that:

(a) have and will prematurely fail;

(b) have and will cause damage to other parts of the building structure; and

(c) have and will cause plaintiffs and class members expenses and labor in repairing and replacing the defective GAF shingles and other damages, including diminution of property value, all of which continues and will continue in the future prior to expiration of the applicable GAF written warranty term.

## COUNT II
### (Violation of Consumer Protection Statutes —
### Deceptive Trade Practices Subclass)

51. Plaintiffs, on behalf of themselves and all others similarly situated, reallege as if fully set forth each and every allegation contained in the preceding paragraphs, and further allege that plaintiffs and many class members are consumers who purchased GAF's shingles or homes on which they were installed for personal use. All Deceptive Trade Practice Subclass States have enacted uniform statutes to protect consumers against unfair, deceptive or fraudulent business practices such as those alleged herein.

52. The consumer protection statute of each state of residence of members of the Deceptive Trade Practices Subclass prohibits either (a) unfair or deceptive trade practices generally, or (b) a

27

680

specified list of deceptive trade practices, including the representation that goods have characteristics, uses, benefits, or qualities that they do not have or that goods are of a particular standard, quality, or grade if they are another.

53. By the misrepresentations and non-disclosure of material facts alleged above, GAF deceived and continues to deceive consumers. This conduct constitutes unlawful, unfair, and fraudulent business practices within the meaning of the consumer protection statutes of the state of residence of members of the Deceptive Trade Practices Subclass. In addition, GAF's use of print media to promote the sale of defective shingles through false and deceptive representations as alleged above constitutes unfair competition and unfair, deceptive, untrue, or misleading advertising within the meaning of such state consumer protection statutes. This unlawful, unfair, and fraudulent business practice and false and misleading advertising and unfair competition by GAF continues to present a threat to members of the public. GAF has systematically perpetrated a fraud upon members of the public and refused to admit that they are defrauding the public by this practice, or that GAF intends plaintiffs and class members to be deceived for the sole purpose of enriching GAF.

COUNT III
(Breach of Written Warranty — Written Warranty Subclass
Under 15 U.S.C. §§ 2301(6) and 2310(d)(1)(A) and/or UCC § 2-313)

54. Plaintiffs, on behalf of themselves and all others similarly situated, reallege as if fully set forth each and every allegation contained in the preceding paragraphs, and further allege that GAF has breached its express warranty to the plaintiffs and class members in that GAF shingles are not free of manufacturing defects and otherwise, do not perform as warranted. Furthermore, GAF has failed

28

060

and refused to honor the terms of its written warranty, causing the warranty to fail of its essential purpose.

55. Plaintiffs and class members have suffered direct and consequential damages because their GAF shingles were defectively manufactured and resulted in actual damages in that they have purchased and installed on homes GAF shingles that will prematurely fail (and sometimes cause damage to other parts of the building structure) and have caused plaintiffs and class members to incur expenses, either already or in the future.

## COUNT IV
**(Breach of Implied Warranties — Implied Warranty Subclass**
**Under 15 U.S.C. §§ 2301(7) and 2310(d)(1) and/or UCC § 2-314(2)(c))**

56. Plaintiffs, on behalf of themselves and all others similarly situated, reallege as if fully set forth each and every allegation contained in the preceding paragraphs, and further allege that GAF has breached the implied warranty of merchantability in that GAF shingles were defective and not fit for the ordinary purposes for which such shingles are used, that is, to provide a durable, long lasting, suitable, and aesthetically pleasing exterior protection for residences and other buildings.

## RELIEF REQUESTED

WHEREFORE, plaintiffs on behalf of themselves and all others similarly situated, pray the Court to enter judgment against GAF and in favor of the named Plaintiffs and the class, and to award the following relief:

(a) order that this action proceed as a class action pursuant to Alabama R. Civ. P. 23(a)(1)-(4) and (b)(3) for damages under Counts I-IV, with appropriate Subclasses and subgroups thereof as described in ¶ 39; and

29

091

(b) enter judgment for plaintiffs and class members for compensatory damages, including prejudgment interest, for breach of written and implied warranty, deceptive trade practices, and fraud by nondisclosure; and

(c) award class counsel a reasonable fee from the common fund generated hereby.

**JURY DEMAND**

Plaintiffs demand that all issues triable by jury be so tried.

DATED:    May 15, 1996

*[signature]*

James C. Johnston (JOH064)
JOHNSTON, WILKINS & DRUHAN
P.O. Box 154
Mobile, Alabama 36601
Telephone:(334) 432-0738
Facsimile:(334) 432-4874

*[signature]*

John W. Sharbrough, III
EZELL & SHARBROUGH, L.L.C.
Post Office Box 996
Mobile, Alabama 36601-0996
Telephone:(334) 432-1413
Facsimile:(334) 432-5297

Of Counsel:

Mark Ezell, Esq.
EZELL & SHARBROUGH, L.L.C.
P.O. Box 595
Butler, Alabama 36904
205.459.3739
205.459.3730 fax

30

David J. Guin, Esq.
HOGAN, SMITH & ALSPAUGH, P.C.
2323 Second Avenue North
Birmingham, Alabama 35203
205.324.5635
205.324.5637 fax

**Out of State Counsel: not yet admitted Pro Hac Vice (listed for notice purposes only).**

Kenneth G. Gilman, Esq.
GILMAN & PASTOR
One Boston Place
28th Floor
Boston, Massachusetts 02108
617.589.3750
617.589.3749 fax

## CERTIFICATE OF SERVICE

I do hereby certify that a copy of the foregoing has been served upon GAF Building Materials Corporation, 1361 Alps Road, Wayne, New Jersey 07470, by mailing same by the United States Mail, properly addressed and first class postage prepaid on the 15th day of May, 1996.

John W. Sharbrough, III

093

GAF

Certificate No. #21

# LIMITED WARRANTY GAF® ASPHALT SHINGLES

1. WARRANTY. GAF warrants to the original owner of GAF Asphalt Shingles ("Shingles"), subject to the conditions set forth in this Warranty, that Shingles will remain free from manufacturing defects for the warranty period corresponding to each of the Shingles enumerated below and that wind-resistant Shingles will resist wind damage for five years from completion of the installation date.

2. REMEDIES AND LIMITATION OF LIABILITY. To remedy breach of the above warranties, GAF will:

a. replace professionally-installed Shingles containing manufacturing defects within one year of completion of installation with an equivalent amount of Shingles and will pay 100 percent of the reasonable labor cost for replacing these Shingles, provided, however, that GAF's maximum liability will not exceed the original purchase price of the Shingles and reasonable original installation costs. During the remaining warranty period, GAF will adjust valid claims for professionally-installed Shingles containing manufacturing defects by an amount determined by decreasing annually the original purchase price of the Shingles divided by the remaining warranty period, less any costs incurred by GAF for replacement during previous years;

b. replace non-professionally installed Shingles containing manufacturing defects within one year of completion of installation and both professionally and non-professionally installed Shingles damaged by wind within one year of completion of installation with an equivalent amount of Shingles provided, however, that GAF's maximum liability will not exceed the original purchase price of the Shingles. During the remaining warranty period, GAF will adjust valid claims for non-professionally installed Shingles containing manufacturing defects and for professionally and non-professionally installed Shingles damaged by wind by an amount determined by decreasing the original purchase price of the Shingles divided by the remaining Warranty period, less any costs incurred by GAF for replacement during previous years.

This Warranty and the remedies provided thereunder are valid only if Shingles are applied pursuant to accepted installation methods and in accordance with the instructions, copies of which instructions (together with copies of this Warranty) may be inspected prior to purchase. GAF, whenever possible, will replace Shingles with Shingles of the same color and design. However, since color variations exist between Shingles manufactured at different times or since GAF may discontinue or modify the Shingles, GAF reserves the right to replace defective Shingles with Shingles of a similar color and/or design.

3. LIMITATIONS ON COVERAGE. GAF will not be liable for, and this Warranty does not apply to:

a. labor costs incurred for the application of the Shingles except as provided for herein, tear-off, metal work, flashing or other related work;

b. failure, defect, damage or loss resulting from tear-off, flashing or metal work, insulation or underlayments, improper or faulty initial application of Shingles or subsequent alterations of any roof or from misuse, neglect or improper storage of Shingles;

c. ANY DAMAGE TO THE INTERIOR OR EXTERIOR OF ANY BUILDING, OR TO ANY PROPERTY CONTAINED THEREIN, OR FOR ANY INJURIES OR DAMAGES SUSTAINED BY ANY PERSON, OR CONSEQUENTIAL OR SPECIAL DAMAGES OF ANY KIND WHATSOEVER.

d. claims for wind damage to wind-resistant Shingles, unless supported by evidence that wind was the direct cause of the damage;

e. subsequent owners or transferees. THIS WARRANTY IS PERSONAL TO THE ORIGINAL OWNER AND IS NOT ASSIGNABLE OR TRANSFERABLE UNDER ANY CIRCUMSTANCES;

f. damage to roofs caused by lightning, gale, hurricane, tornado, hailstorm, impact of foreign objects or other violent storm or casualty, or damage to roofs due to settlement, distortion, failure or cracking of the roof deck, walls or foundation of a building, or any defect in or failure of material used as a roof base over which Shingles are applied, or damage by traffic on the roof, or damage from any cause other than inherent manufacturing defect.

4. NOTIFICATION OF CLAIMS. Claims pursuant to this Warranty, whether for alleged manufacturing defects or wind damage, must be submitted in writing, together with proof of purchase, labor costs when applicable, and application dates to Building Materials Group, GAF Corporation, 140 West 51st Street, New York, New York 10020 within 30 days after discovery of the alleged defect and/or wind damage to Shingles. To more conveniently establish the purchase and application dates, complete the registration certificate attached to this Warranty and mail it promptly after completion of the Shingles application. This Warranty is not contingent upon return of the registration certificate. However, all correspondence must contain the certificate number set forth above. GAF, within a reasonable time after notification of damage, will investigate the claim and, if GAF determines that the damage is covered by this Warranty, GAF will resolve the complaint in accordance with the terms of this Warranty within 60 days after actual receipt by GAF of notification of damage. GAF will not be liable for unauthorized replacement or for the cost of replacement incurred prior to written acknowledgment by GAF that it will replace the defective Shingles.

5. SOLE WARRANTY. THIS WARRANTY IS EXCLUSIVE AND REPLACES ALL OTHER WARRANTIES WHETHER EXPRESS OR IMPLIED BY LAW INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR USE OR PURPOSE. NO REPRESENTATIVE, EMPLOYEE OR AGENT OF GAF, OR ANY OTHER PERSON, HAS AUTHORITY TO ASSUME FOR GAF ANY ADDITIONAL LIABILITY OR RESPONSIBILITY IN CONNECTION WITH SHINGLES EXCEPT AS DESCRIBED ABOVE. IN NO EVENT, WHETHER FOR BREACH OF THIS WARRANTY, NEGLIGENCE OR FOR ANY OTHER CAUSE, WILL GAF BE LIABLE FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES OF ANY KIND.

SOME STATES DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR CONSEQUENTIAL DAMAGES SO THE ABOVE EXCLUSIONS OR LIMITATIONS MAY NOT APPLY TO YOU.

*Type of GAF® Asphalt Shingle applied. Check appropriate box.*

| | | | |
|---|---|---|---|
| ☐ Standard Tite-On® | 15-Year Warranty | ☐ Suburban® Self-Sealing | 25-Year Warranty |
| ☐ Dubl-Coverage® Tite-On® | 17-Year Warranty | ☐ Sovereign® Self-Sealing | 25-Year Warranty |
| ☐ Cliptlast® Hexagonal | 15-Year Warranty | ☐ Fire Guard™ Self-Sealing | 25-Year Warranty |
| ☐ Standard Self-Sealing | 15-Year Warranty | ☐ Timberline® Self-Sealing | 25-Year Warranty |
| ☐ Noreaster® Self-Sealing | 15-Year Warranty | ☐ ____________ | ___ Year Warranty |
| ☐ Sentinel™ Fiber Glass Self-Sealing | 20-Year Warranty | | |

GAF BUILDING MATERIALS CORPORATION
A Subsidiary of GAF CORPORATION
1361 Alps Road • Wayne, N.J. 07470

Contractor's Signature ______________________ Date ____________

**EXHIBIT B**

PAGES 1 - 147

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

```
------------------------------
JOHN and PENNY COLEMAN, JEX R.   (
and ANN H. LUCE, JR., EDWARD      (
and LUCIAN S. "POPPY" FIELDS,     (
EDWARD R. DILLON and JOCELYN      (
EDELSTON, individually and on     (
behalf of a class of similarly    (
situated persons,                 (
                                  (
            Plaintiffs            (  Civil Action No.
                                  (  CV-96-0954-GALANOS
            v.                    (
                                  (
GAF BUILDING MATERIALS CORP.,     (
                                  (
            Defendant             (
------------------------------
```

Deposition of Peter P. Gacicia

Tuesday, December 10, 1996

Gilman & Pastor

One Boston Place - 28th Floor

Boston, Massachusetts

ORIGINAL

*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
J. EDWARD VARALLO, RPR/RMR
FRITZ & SHEEHAN ASSOCIATES, INC.
295 DEVONSHIRE STREET - BOSTON, MASS. 02110
617/423-0500   FAX 617/423-0501

FRITZ & SHEEHAN ASSOCIATES, INC.

1

Peter P. Gacicla

1    early days, did you ever have a job in real estate,
2    construction, roofing or engineering?
3         A.  No.
4         Q.  Turning if you would, Mr. Gacicla, to
5    Exhibit 78, which is a March 14 letter from you to
6    Ms. Oberer at GAF.  Do you see that?
7         A.  Mm-hmm.
8         Q.  Which as produced to me this morning is a
9    five-page document.  If you go to the last page, do
10   you see the last page?
11        A.  Yes.
12        Q.  It looks like what I guess what I would call a
13   deed, which is a transfer certificate of title.
14   You see that at the top?
15        A.  Mm-hmm, yes.
16        Q.  Do you recognize that as at least the
17   first page of the piece of paper pursuant to which
18   you bought your house in Milton?
19        A.  Yes.
20        Q.  What is your street address in Milton?
21        A.  174 Hillside Street.
22        Q.  This deed appears on its face to have
23   been registered in 1987 but it recites it was
24   originally registered in April 1986.  When did you

FRITZ & SHEEHAN ASSOCIATES, INC.

Peter P. Gacicia

```
 1   buy the house?
 2   A.   I believe I bought the house in '87,
 3   early '87.  I had contracted to have the house
 4   built.
 5   Q.   So this house was built for you?
 6   A.   That is correct.
 7   Q.   And it is presently owned by you and your
 8   wife, Penny?
 9   A.   That's correct, yes.
10   Q.   Mr. Gacicia, was Mrs. Gacicia involved in
11   any way in issues relating to your roof and the
12   shingles?
13   A.   No.
14   Q.   She didn't talk to anybody about it,
15   didn't complain to you about it?
16   A.   No.
17   Q.   Does Mrs. Gacicia still reside in the
18   house in Milton?
19   A.   Yes.
20   Q.   I apologize for the personal-sounding
21   part of that question.  It has to do with legal
22   technicalities, Mr. Gacicia.
23             Have you had any discussions with
24   Mrs. Gacicia about her becoming a plaintiff in this
```

FRITZ & SHEEHAN ASSOCIATES, INC.

Peter P. Garcia

1    Q.   And why had you selected that?

2    A.   Well, I think there were a number of

3    reasons.  Number one, the coloring of the

4    Timberline GAF heather blend fit with the coloring

5    of the brick that I had selected and it integrated

6    very well to the wooded environment that I was in.

7         Plus at the time I recall that there was

8    advertising on the part of GAF where they were

9    representing that the GAF type shingles compared to

10   other types of shingles that were out on the market

11   were superior.  And knowing or at least being of

12   the opinion that GAF was a reputable company,

13   producing a very, very high-quality product that

14   seemed to be backed with a very good warranty,

15   that's what I had selected as part of the roof

16   shingles, like I did with the windows, because

17   that's a very, very important decision.

18   Q.   Mr. Garcia, when did you have these

19   discussions with George?

20   A.   Probably -- I don't know -- mid to fall

21   of '86, possibly.  I don't recall the...

22   Q.   If the revised deed is June of '87, as it

23   appears to be, does June of '87 seem to be about

24   when you moved into the house or shortly

35

Peter P. Garcia

```
 1   thereafter?
 2       A.   Yeah, that's about right.  But I believe
 3   the discussions would have been prior to him going
 4   out and purchasing the material to roof my house.
 5   I believe the roofing was done late fall or early
 6   winter of '86, if my memory serves me right.
 7       Q.   Is there some piece of paper there that
 8   would help you?
 9       A.   No.
10       Q.   In Quincy did you live in a house?
11       A.   Yes.
12       Q.   How long had you lived in that house?
13       A.   Approximately seven years.
14       Q.   What kind of roof did it have?
15       A.   I believe it was a hip roof.
16       Q.   What kind of shingles did it have on the
17   roof?
18       A.   I don't know.
19       Q.   Were those shingles on the roof when you
20   had bought that house?
21       A.   Yes.
22       Q.   You don't know whether they were GAF
23   shingles or not?
24       A.   That's correct, I don't know.
```

FRITZ & SHEEHAN ASSOCIATES, INC.

FRITZ & SHEEHAN ASSOCIATES, INC.

1    A.   That's correct.

2    Q.   What was the first indication you had

3    that you were getting roof leaking?

4    A.   First indication?   Approximately --

5    I don't know -- three, four months prior to me

6    calling up GAF and establishing a claim.

7    Q.   So we're talking about right after the

8    turn of the year 1996?

9    A.   Well, let me see, when did I -- ?

10   I think I contacted GAF on February 28th so, no,

11   late of '95, I would think.  About four months

12   prior to I called them.  It was based upon I had

13   noticed some leaking and some seepage of moisture

14   in the attic and some of the roofing and at that

15   time I did something I normally wouldn't do, which

16   is take a look at the roof.  And what I noticed was

17   this vertical and horizontal cracking or splitting

18   or I'm not sure what the correct term would be that

19   seemed to be on the roof.  And it was at that point

20   in time, and I didn't think much of it, and it got

21   to the point where, geez, I think I should call GAF

22   and just say I've noticed this cracking; I'm

23   experiencing this, and how should I proceed?

24   Q.   Did you go up on the roof yourself?

Peter P. Gacicia

FRITZ & SHEEHAN ASSOCIATES, INC.

```
 1          A.   What I did was, I was able to see a
 2   portion of the roof from within my home.  And what
 3   I did then was, I notified on February 28 GAF of
 4   the problem and they sent out one of their field
 5   representatives to take a look at it.  And one of
 6   the things that he did was, he left me -- this is
 7   on the letter dated March 14; his name was
 8   Christopher Mooney.  This is what he left me here.
 9   And what I tried to do, because I like to keep at
10   least records on this that I'm having a problem
11   with, I had specifically requested, now, this is a
12   great form, but can I get a copy of what the nature
13   of the problem was and what did he see and can
14   I get copies of the photographs?
15          And to this point I don't know if
16   he's the one responsible, but when I've asked on
17   numerous occasions on telephone calls of the
18   service department can I get a copy of the report,
19   they seem to be unwilling to send it to me.  And
20   I can't understand why as a consumer that they
21   won't send me the report based upon what this
22   gentleman found of the condition of my property.
23          Q.   The documents left you by Mr. Mooney are
24   the second, third and fourth pages of Exhibit 78,
```

Peter P. Gacicia

FRITZ & SHEEHAN ASSOCIATES, INC.

Peter P. Gacicia

```
 1        A.   I don't know.  September or October time
 2   frame.  I'm not very good on recalling dates, but
 3   I think it was around September or October of this
 4   year.
 5        Q.   As in two or three months ago?
 6        A.   Yes.
 7        Q.   I have probably got this wrong then.
 8   When do you recall you first saw leaking?  Was the
 9   leaking you saw in the attic the first sign that in
10   your mind there was something wrong with your roof?
11        A.   Yes.  And that was four months,
12   approximately three to four months prior --
13        Q.   September or October?
14        A.   -- prior to me calling up on February
15   28th of '96 to let GAF know here's what I've
16   noticed, horizontal, vertical cracking, leaking in
17   my home, requesting of them what should I do, and
18   then that's what initiated the process.
19        Q.   And it was in September or October of
20   this year that you got Nova to go out and caulk
21   your roof?
22        A.   Yes.
23        Q.   And the bad recent storm to which you had
24   reference was before or after Nova finished
```

FRITZ & SHEEHAN ASSOCIATES, INC.

146

Commonwealth of Massachusetts )
                               )
County of Suffolk              )

COURT REPORTER'S CERTIFICATE

I, J. Edward Varallo, RPR/RMR (Registered Professional Reporter, Registered Merit Reporter) and Notary Public in the Commonwealth of Massachusetts, hereby certify that there came before me on December 10, 1996, at the time and place specified above, Peter P. Gaciola, the deponent herein, who was duly sworn by me to testify to the truth and nothing but the truth, and thereafter examined under oath by counsel.

I certify that the questions asked of the deponent and the answers given were taken down by me stenographically and thereafter transcribed by me using computerized translation software and printed out (laser printer) in typewritten transcript format; and that the foregoing is a true and accurate transcript of the questions asked of the deponent and the answers given.

I certify further that I am neither attorney, counsel, or relative of any party litigant, nor otherwise interested in the event of this suit.

_____
J. Edward Varallo, RPR/RMR
MY COMMISSION EXPIRES
JANUARY 11, 2002

DATED:        12/18/96

**EXHIBIT C**

**GILMAN AND PASTOR, LLP**

ATTORNEYS AT LAW

ONE BOSTON PLACE

28TH FLOOR

BOSTON, MASSACHUSETTS 02108

TELEPHONE: 617/589-3750                                                                Facsimile: 617/589-3749

March 11, 1999

Patrick Perrone, Esq.
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

Re:    Coleman, et al. v. GAF
       CA No. 96-0954-GALANOS

Dear Pat:

Pursuant to our prior agreement, the following persons and entities have made a decision to exclude themselves and opt out of the Settlement Class. This will confirm that you, on behalf of GAF, agreed to allow these people to opt out of the Settlement prior to the date for opt outs to be submitted.

1.    Peter Gacicia, 174 Hillside Street, Milton, Massachusetts 02186;

2.    Ripley Condominium Association, c/o Modica Associates Property, Management Corp., 475 Commonwealth Avenue, Boston, Massachusetts 02215;

3.    Robert M. Mahoney, 37 Longfellow, Wellesley, Massachusetts 02481;

4.    Jerry Swanson, Minneapolis, Minnesota;

5.    Richard Massucco, 18 Governor Fuller Road, Billerica, Massachusetts 01821;

6.    Greg McCurrio, 180 Mineral Spring Avenue, North Providence, Rhode Island 02904.

Very truly yours,

Kenneth G. Gilman

**EXHIBIT D**

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| PENNY COLEMAN, JEX R. and ANN H. EDELSTON, individually and on behalf of a class of similarly situated persons, | ( | |
| | ( | |
| | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | Civil Action Number: |
| vs. | ( | |
| | ( | |
| GAF BUILDING MATERIALS CORPORATION, | ( | CV-96-0954-GALANOS |
| | ( | |
| Defendant. | ( | CLASS ACTION |

## SETTLEMENT AGREEMENT

THIS SETTLEMENT AGREEMENT ("Agreement") is entered into this 24th day of September, 1998, by and among: (a) the named Plaintiffs in this case, for themselves and on behalf of the Plaintiff Settlement Class as hereinafter defined ("Settlement Class"); and (b) Defendant GAF Building Materials Corporation as hereinafter defined ("Defendant"). The Plaintiffs and Defendant, collectively, are referred to hereinafter as the "Parties."

Subject to Court approval as required by the Alabama Rules of Civil Procedure, it is hereby stipulated and agreed by the Parties that, in consideration of the promises and covenants set forth in this Agreement and upon the entry by the Court of a Final Order and Judgment approving the Settlement and directing the implementation of the terms and conditions of the Settlement as set forth in this Agreement, this Action (hereinafter "Action") shall be settled and compromised upon the terms and conditions contained herein.

## A. <u>DEFINITIONS</u>

As used in this Agreement and the Exhibits annexed hereto, and in addition to any definitions elsewhere in this Agreement, the following terms shall have the meanings set forth *below*:

1. **GAF** or **Defendant** means Defendant GAF Building Materials Corporation, including its subsidiary Building Materials Corporation of America d/b/a GAF Materials Corporation, and their directors, officers, agents, parent companies, sister companies, subsidiaries, affiliates, assigns, suppliers, vendors, distributors, representatives, predecessors, successors-in-interest, attorneys or other representatives.

2. **GAF Organic Shingles** means any and all organic based shingles manufactured by GAF from January 1, 1973 until December 31, 1984, including, but not limited to, Timberline, Fire Guard, Standard Self-Sealing, Nor'easter, Sovereign, Suburban, and Dubl-Coverage Tite-On.

3. **GAF Fiberglass Shingles** means any and all fiberglass based shingles manufactured by GAF from January 1, 1976 until December 31, 1997, including, but not limited to, Nor'easter, Dubl-Coverage Tite-On, Sentinel, Royal Sovereign, Slateline, GAF Wood Line, Timberline, Timberline Ultra, Marquis, and Grand Sequoia.

4. **Action** means the above-captioned action, <u>Coleman, et al. v. GAF Building Materials Corporation, et al.</u>, Case No. CV-96-0954, in the Circuit Court of Mobile County, Alabama.

5. **Agreement** or **Settlement** or **Settlement Agreement** means this Settlement Agreement, including and incorporating herein by reference all Exhibits.

6. **Approved Compensable Damage** means the greater amount of Compensable Damage as determined by the Claims Office or the Claims Reviewer (if review is sought pursuant to Section E.2.g.).

-3-

7.     **Attorneys Fees** means the amount awarded by the Court as compensation for the services provided by Plaintiffs' Class Counsel, including reimbursement of costs and expenses (including expert witness fees and expenses), which is not to exceed $4.625 million. The Attorneys Fees shall be paid in addition to, and shall not be a reduction of, the Replacement Compensation payable to Eligible Claimants pursuant to this Agreement. The amount of Attorneys Fees approved by the court shall include simple interest computed at the rate of 4% per annum, commencing upon September 1, 1999 and continuing until the date on which such Attorneys Fees are actually paid. Attorneys Fees are payable on the Settlement Date.

8.     **Administrative Expenses** means the costs and expenses to be paid by Defendant in connection with the settlement of this Action and the execution and administration of this Agreement.

9.     **Causation Exceptions** means the installation or other conditions listed below. GAF Shingles will not be considered Damaged to the extent GAF can establish, subject to review by the Claims Reviewer, that any of the listed Causation Exceptions is or was the "principal cause" of the Damage. GAF shall bear the burden of establishing that a Causation Exception is or was the principal cause of the Damage in question. The Causation Exceptions are:

a.     For any Claim or Property,

(1)     intentional, reckless or negligent physical damage to GAF Shingles (unrelated to installation, maintenance or weather) caused directly or indirectly by a Claimant or other Person;

(2)     damage to GAF Shingles caused by roof deck movement; or

(3)     damage to GAF Shingles to the extent resulting from natural disaster including, but not limited to, hail, unusually strong storms or winds

above 60 miles per hour, fire, hurricane, flood, earthquake, earth movement, or other similar *force majeure* events.

b.      For Claims or Properties involving *more than 100 squares of GAF Shingles only*, the Causation Exceptions also include:

(1)      improper installation (*i.e.*, not in accordance with GAF's printed installation instructions applicable to Claimant's GAF Shingles at the time of their installation);

(2)      subsequent structural changes or alterations to the Property, including, but not limited to, installation of equipment on the roof (such as solar heating or air conditioning equipment and TV antennas), or any other modifications;

(3)      inadequate attic ventilation;

(4)      excessive or unreasonable traffic on the roof;

(5)      improper storage or handling of shingles.

10.      **Claim** or **Claims** means a Claim for Existing Damage or Claim for Unreimbursed Repair submitted to the Claims Office pursuant to the Claims Program established by this Agreement.

11.      **Claimant** means anyone who submits a Claim in the Claims Program.

12.      **Claim for Existing Damage** means a Claim seeking compensation for Damage relating to GAF Shingles that have not been repaired or replaced prior to the Settlement Date, completed in the form of Exhibit "A", attached to this Agreement and filed with the Claims Office during the Claims Period.

13.      **Claim for Unreimbursed Repair** means a Claim seeking compensation for Damage relating to GAF Shingles that have been repaired or replaced prior to the Settlement Date.

-4-

completed in the Form of Exhibit "B" attached to this Agreement and filed with the Claims Office during the Claims Period.

14. **Claims Office** means the office or department established by Defendant for the purpose of implementing and managing the Claims Program established by this Agreement.

15. **Claim Period** or **Claims Period** means that period of time that expires at the end of the warranty period applicable to the type of GAF Shingle for which a claim is made as set forth in Schedule A, attached to this Agreement. In the case of Prior Unreimbursed Repairs, however, the Claim Period or Claims Period means two years from the Notice Date.

16. **Claims Program** means the procedure set forth in Section E for processing claims.

17. **Claims Reviewer** means the firm retained by mutual agreement of Plaintiffs' Co-Lead Counsel and Defendant, with the approval of the Court, to provide certain services with respect to this Agreement, including the review of disallowed Claims in accordance with the procedures set forth in Section E.2.

18. **Compensation Formula** means the formula set forth in Section E used to determine the compensation paid to an Eligible Claimant pursuant to the Claims Program established by this Settlement Agreement, and as adjusted for inflation as set forth in Section E.5.

19. **Court** means the Circuit Court of Mobile County, Alabama in which the Action is pending.

20. **Cracking** means cracking, tearing or splitting of the Fiberglass Shingle mat or the Organic Shingle mat.

21. **Consequential Damages** means damage to the structure or contents of a Property resulting from Damage to GAF Shingles. Consequential Damages do not include any labor or material costs associated with the repair or replacement of the GAF Shingles or any other roofing materials (e.g., flashing, underlayment, gutters, drip edge, and ice and water barrier).

-9-

22.     **Damage, Damages** or **Damaged** with respect to GAF Shingles means defects that adversely affect the performance of the shingle(s), including the failure to present reasonably appropriate aesthetics, during the warranty term, all as more particularly described in Exhibit "C," attached to this Agreement. This definition is subject to the "Causation Exceptions" set forth above.

For Claims or Properties involving 100 squares or less of GAF Shingles: If any GAF Organic or Fiberglass Shingle on a roof is Damaged, then the entire roof shall be deemed Damaged, and the Replacement Compensation shall be calculated as if the entire roof has or had suffered Damage.

For Claims or Properties involving more than 100 squares of GAF Shingles: If any GAF Organic or Fiberglass Shingle on a roof is Damaged, there shall be a presumption that the entire roof is Damaged, and the Replacement Compensation shall be calculated as if the entire roof has or had suffered Damage. If, however, Defendant can prove to the Claims Reviewer that Damage is limited to a particular plane or planes of the roof, Defendant will compensate the Eligible Claimant for each roof plane on which any Damage exists.

23.     **Date of the Claim** means the date on which a Claim for Existing Damage is received by the Claims Office. The Parties agree that Claims for Unreimbursed Repair shall be recognized as of the date of the repair, and Prior Unreleased Claims shall be recognized as of the date the Prior Unreleased Claim was originally received by Defendant.

24.     **Date of Installation** means the date or approximate date that GAF Shingles were installed on the Property of a Settlement Class Member. In the absence of reasonable documentation, by affidavit or otherwise, concerning the Date of Installation, the Date of Installation will be presumed to be the date of: (a) the certificate of occupancy; or (b) the date on

which Defendant concludes (after visual examination of the Shingle) that the Shingle was manufactured, whichever is later.

25.    **Eligible Claimant** means Settlement Class Members who submit their Claims, and substantially all information and materials required therein, within the time limits set out in this Agreement, who have Damage with respect to GAF Shingles, and who meet the following requirements:

a.    a current owner of Property on the date of Final Order and Judgment in this Action;

b.    a current or former owner of Property on the date of Final Order and Judgment in this Action who has a claim or lawsuit pending against Defendant;

c.    a current or former owner of Property who made a Prior Unreimbursed Repair;

d.    a current or former owner of Property who made a Prior Unreleased Claim; or

e.    a successor-in-interest or transferee of an owner of Property on the date of Final Order and Judgment in this Action.

26.    **Eligible Claimant and Claimant** does not include persons, associations, or entities who made claims to or filed lawsuits against Defendant, and whose claims or lawsuits were resolved by Release or Final judicial action.

27.    **Fairness Hearing** means the settlement approval hearing(s) to be conducted by the Court in connection with the determination of the fairness, adequacy and reasonableness of this Agreement in accordance with Ala. R. Civ. P. 23(c).

-8-

28.     **Field Inspection Report** means the report, in a form to be mutually agreed upon by the parties, to be completed by the Independent Inspector firm when conducting an inspection of a Property at the request of the Claims Reviewer.

29.     **Final Order and Judgment** means the Order to be entered by the Court, in a form that is mutually agreeable to the Parties, approving this Agreement as fair, adequate and reasonable and in the best interests of the Settlement Class as a whole in accordance with Ala. R. Civ. P. 23(e), confirming the Settlement Class certification, and making such other findings and determinations as are necessary and appropriate to effectuate the terms of this Agreement.

30.     **GAF Shingle(s)** or **Shingle(s)** means any GAF Organic Shingles or GAF Fiberglass Shingles manufactured by the Defendant from January 1, 1973 through December 31, 1997.

31.     **Independent Inspector** or **Inspector** means the firm(s) or person(s) retained by mutual agreement of Plaintiffs' Counsel and Defendant, with the approval of the Court, to inspect Properties at the request of the Claims Reviewer.

32.     **Initial Notice Date** means the first date upon which the Notice of Proposed Class Action Settlement is made to the Settlement Class pursuant to Section F.

33.     **Notice Administrator** means the firm hired to implement the Notice Plan.

34.     **Notice of Proposed Class Action Settlement** means the Court-approved written notice to Settlement Class Members in the form attached as Exhibit "D" to this Agreement.

35.     **Notice Plan** means the plan and schedule for providing classwide mailed and published notice of the settlement and certification of the Settlement Class, including the Notice of Proposed Class Action Settlement and summary forms of notice, all as more particularly described in a form to be mutually agreed upon by the parties.

-6-

36.    **Opt-Out Period** means the 60-day period from the date of the Initial Notice Date.

37.    **Parties** means Plaintiffs, the Settlement Class, and the Defendant.

38.    **Person** means any individual or legal entity or their successors or assigns.

39.    **Plaintiffs** means the individuals acting as named representative Plaintiffs in this Action.

40.    **Plaintiffs' Class Counsel** includes Kenneth G. Gilman, GILMAN AND PASTOR, LLP, One Boston Place, 28th Floor, Boston, MA 02108; James Yance, CUNNINGHAM, BOUNDS, YANCE, CROWDER AND BROWN, 1601 Dauphin Street, Mobile, AL 36604; David Guin, DONALDSON GUIN & SLATE, L.L.C., 2900 Highway 280, Suite 230, Birmingham, AL 35223; John W. Sharbrough, III, SHARBROUGH LAW FIRM, 407 Conti St., Post Office Box 996, Mobile, AL 36601; James C. Johnston, JOHNSTON, WILKINS & DRUHAN, LLP, 157 North Conception Street, PO Box 154, Mobile, AL 36601; John W. Coleman, JOHN W. COLEMAN, ATTORNEY AT LAW, 103 Dauphin Street, Mobile, AL 36602.

41.    **Preliminary Approval** means the Court's provisional certification of the Settlement Class, preliminary approval of this Agreement, and approval of the form of the Class Notices pursuant to Ala. R. Civ. P. 23(c)(2) and (e).

42.    **Prior Claim** means a claim or request made by a Person to Defendant, for compensation because of Damage relating to GAF Shingles, and submitted to Defendant prior to the Settlement Date.

43.    **Prior Released Claim** means a Prior Claim that was paid by the Defendant for the entire area of the roof and as to which the Claimant Released the Defendant.

-10-

44.     **Prior Unreleased Claim** means a Prior Claim that was not paid by the Defendant. Prior Unreleased Claim includes a Prior Claim in which Defendant paid for Damage relating to GAF Shingles on part of the roof, but did not pay for Damage relating to GAF Shingles on the remainder of the roof, even if the Claimant executed a full release to the Defendant. In such cases, the Prior Unreleased Claim refers only to the portion of the roof for which no payment was made.

45.     **Property** or **Properties** means any structure including homes, mobile homes, town homes, condominiums, apartments, commercial structures, garages, and other types of buildings or structures on which GAF Shingles have been installed.

46.     **Pro-Rated** or **Pro-Ration** means a reduction in any compensation due an Eligible Claimant. The applicable reduction will be calculated as of the date of the Claim by dividing the number of months elapsed since the Date of Installation by the number of months in the original warranty period.

47.     **Release** means and consists of a signed written release, a cashed settlement check or a redeemed materials certificate with release language.

48.     **Replacement Compensation** means the total compensation paid to an Eligible Claimant pursuant to the Compensation Formula set forth in Section E.3.

49.     **Replacement Labor Cost** relates only to GAF Shingles manufactured between January 1, 1990 and December 31, 1997, and means the reasonable labor cost to apply new shingles only, and excludes all other costs including, but not limited to, costs associated with underlayment, metal work, flashing, tear off and disposal of shingles. Replacement Labor Cost will be based upon the average reasonable labor cost (per square) to apply new shingles only, in the State where the Property is located, with reference to the Means Price Data published by R.S. Means Co., Inc., but,

-11-

in any event, not less than $61 per square for GAF's fiberglass laminated shingles, or $54 per square for GAF's fiberglass strip shingles, and will be adjusted for inflation as set for in Section E.5, *below*.

50.    **Settled Claims** means any claim, liability, right, demand, suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description, in law or in equity, that the Releasing Party (as defined in Section 1.1.), has, had or may have, whether known or unknown, asserted or unasserted, latent or patent, that is, has been, or could reasonably have been or in the future might reasonably be asserted by the Releasing Party and against the Defendant either in this Action or in any other action or proceeding, in this Court or any other court or forum, regardless of legal theory, and regardless of the type or amount of relief or damages claimed, arising from or in any way relating to Damage to the GAF Shingles that are the subject of the Releasing Party's claim. Without limiting the scope of the foregoing, "Settled Claim" shall include, but is not limited to:

a.    any claim for Damage to GAF Shingles;

b.    any claim for breach of any federal law, state law, common law or other law, statute, regulation or ordinance;

c.    any claim for breach of any duty imposed by law or by contract;

d.    any claim based on principles of tort or of warranty;

e.    any claim arising from or in any way related to the promotion, design, specification, use, manufacture, production, sale, or distribution of GAF Shingles and/or any alleged defects in GAF Shingles;

f.    any claim for emotional distress, mental anguish or similar damages associated with any of the above;

g.    any claim for penalties, punitive damages, exemplary damages, damages based upon a multiplication of compensatory damages, or attorney fees, whether allowed by federal law, state law or common law; and

h.    any claim for declaratory or injunctive relief associated with the above.

-12-

The term "Settled Claim" does not include the following: (a) any claim for bodily injury (including wrongful death), including claims for pain and suffering, emotional distress, mental anguish or similar damages associated with such bodily injury; (b) claims for Consequential Damages (as defined *above*) and as limited by Section E.6a; and (c) Prior Released Claims.

51.    **Settlement Class or Class** means a class composed of Persons who have owned, or own as of the date of Final Order and Judgment, Property in the United States or its Territories on which GAF Shingles have been installed. Excluded from the Settlement Class are:

a.    All Persons who, in accordance with the terms of this Agreement, properly execute and timely file during the Opt Out Period a request for exclusion from the Settlement Class;

b.    All Persons who released Prior Released Claims asserted or which could have been asserted against Defendant, arising out of, or relating to, GAF Shingles;

c.    All Persons who resolved through final judicial action Prior Claims against Defendant arising out of, or relating to, GAF Shingles; and

d.    All Persons who were or are builders, developers, contractors, manufacturers, wholesalers or retailers of Property, except as to ownership of their personal dwelling or commercial Property.

52.    **Settlement Class Member** means a member of the Settlement Class.

53.    **Settlement Date** means the date on which all of the following have occurred: (a) the entry of the Final Order and Judgment without material modification; and (b) finality for the Final Order and Judgment by virtue of that Order having become final and non-appealable through: (i) the expiration of all allowable appeal periods without an appeal having been filed; or (ii) final affirmance of the Final Order and Judgment on appeal or final dismissal or denial of all such appeals.

54.     **Prior Unreimbursed Repair** or **Unreimbursed Repair** means the documented out-of-pocket expenses reasonably incurred and paid by an Eligible Claimant, prior to the Settlement Date, to repair or replace Damaged GAF Shingles. Claims for Unreimbursed Repair must be filed within two years of the Notice Date.

55.     **Original Owner** means: (a) a Property Owner who installed or caused another person or entity to install GAF Shingles on his/her Property; or (b) was the first occupant of a Property with the GAF Shingles in question.

56.     **Replacement Compensation** means the amount to be paid to Eligible Claimants at their election, as one of the compensation options set forth in Section E.3.

57.     **Subsequent Owner** means a Property Owner who is not the Original Owner but instead purchased or otherwise acquired Property on which GAF Shingles had been previously installed.

**B.     CERTIFICATION OF SETTLEMENT CLASS**

1.     The Parties to this Agreement agree that this Action shall be certified and proceed as a class action solely for purposes of settlement under Ala. R. Civ. P. 23(b)(3), consisting of all Settlement Class Members, with the named Plaintiffs as the Settlement Class representatives and Plaintiffs' Class Counsel as counsel for the Settlement Class. This Agreement is for settlement purposes only, and neither the fact of, nor any provision contained in, this Agreement or its Exhibits, nor any action taken hereunder shall constitute, be construed as, or be admissible in evidence as, any admission of the validity of any claim or any fact alleged by Plaintiffs in this Action or in any other pending or subsequently filed action or proceeding of any wrongdoing, fault, violation of law, or liability of any kind on the part of Defendant or admission by Defendant of any claim or allegation made in this Action or in any action or proceeding. This Agreement shall, however, be admissible in any action or proceeding to enforce the terms of the Agreement.

### C.    SUBMISSION FOR PRELIMINARY APPROVAL

As soon as possible after execution of this Agreement, the Parties shall jointly submit this Agreement, through their respective attorneys, to the Court for Preliminary Approval.

### D.    SETTLEMENT ADMINISTRATION

1.    Defendant, its successors or assigns, shall be responsible for direct payment of the Administrative Expenses incurred in connection with the settlement of this Action, which shall consist of the following:

      a.    The reasonable costs and expenses incurred by the Notice Administrator in connection with the preparation and execution of the Notice Plan;

      b.    The amount to be paid as Attorney Fees as set forth in Section A.7;

      c.    Any Court-approved incentive award to be paid to the named Plaintiffs in this Action as set forth in Section N.4.a.; and

      d.    Payments to Eligible Claimants as set forth in Section E.

2.    The Notice Administrator shall utilize his/her best efforts to minimize operational expenses.

3.    Defendant shall have thirty (30) days from the actual receipt of any demand for payment by the Notice Administrator within which to object to the demand, or any portion thereof, or to the reasonableness of any cost, charge or expense included therein; and, if Defendant does so object, and if the dispute cannot be resolved, the Court shall determine the dispute thereto. To the extent Defendant does not object within such thirty (30) day period, the amount demanded shall be deemed conclusively to be immediately due and payable. Attorneys Fees and incentive awards shall be paid on the Settlement Date. Commencing on the Settlement Date, payments to Eligible Claimants shall be made as provided in Section E.

-14-

E.    **CLAIMS PROGRAM**

1.    **Generally**

A Person is entitled to relief under this Agreement if:

a.    The Person is an Eligible Claimant; and

b.    The Eligible Claimant properly completes a Claim for Existing Damage or Claim for Unreimbursed Repair (Exhibits "A" and "B", attached to this Agreement) and files the Claim for Existing Damage or Claim for Unreimbursed Repair with the Claims Office during the Claim Period; and

c.    Has Damage as defined in Section A. 22.

Upon execution of this Agreement, Defendant shall staff and equip a Claims Office for the purpose of processing Claims and administering the Claims Program. Defendant shall maintain the Claims Office continuously throughout the Claims Period.

2.    **Administration and Payment**

a.    Any Person who believes he/she is an Eligible Claimant shall contact the Notice Administrator to request a Claim for Existing Damage or Claim for Unreimbursed Repair. The Notice Administrator shall provide a Claim for Existing Damage or Claim for Unreimbursed Repair to every Person who requests one during the Claims Period.

b.    Upon receipt of a Claim for Existing Damage or Claim for Unreimbursed Repair, the Claims Office shall record the claim.

c.    The Claims Office shall initially determine whether the Claim for Existing Damage or Claim for Unreimbursed Repair submitted by the Claimant is sufficiently complete for processing. If information relevant to the Claim for Existing Damage or Claim for Unreimbursed Repair is incomplete, the Claims Office shall request such additional information from the Claimant as necessary for processing the Claim. Any such request for additional information must be mailed

-15-

to the Claimant within sixty (60) days after actual receipt of the Claim for Existing Damage or Claim for Unreimbursed Repair by the Defendant.  If no additional information is sought from the Claimant during this sixty (60) day period, the Claim shall be deemed "complete" for processing. Any Claim for which additional information is requested shall be deemed "complete" for processing upon the earlier of receipt by the Claims Office of the requested information or a reasonable substitute therefor, or upon the determination by the Claims Reviewer that the Claimant has provided sufficient information to process the Claim.  If a Claimant fails to furnish such additional information after Defendant's request, the Defendant shall not be required to pay the Claimant compensation under the Claims Program, until such information is provided.  Any dispute over the actual or alleged failure of the Claimant to timely furnish such requested information (or the necessity of such information) may be reviewed by the Claims Reviewer upon request of a Claimant.

d.    Defendant shall be entitled to inspect the Claimant's Property and Damage at a reasonable time and at its own expense, upon prior written notice to the Claimant, provided that the inspection must be completed within forty-five (45) days -- weather permitting -- after sending written notice to the Claimant of Defendant's decision to inspect the Property.

e.    Within ninety (90) days after a Claim for Existing Damage or Claim for Unreimbursed Repair is deemed complete, the Defendant shall make an initial determination as to whether the Claimant is an Eligible Claimant, shall calculate the Replacement Compensation, if any, due the Eligible Claimant in accordance with the Compensation Formula (as hereinafter set forth in Section E.3), and shall notify the Eligible Claimant by first class mail of the Defendant's determination.  Defendant shall also provide an Eligible Claimant with a description of the available compensation options and an Election Form to be completed and executed by the Claimant in a form to be mutually agreed upon by the parties.

-17-

f.    Within forty-five (45) business days of the receipt by the Claims Office of the Election Form completed and executed by the Claimant, Defendant shall pay the Replacement Compensation directly to the Eligible Claimant. Such payment amounts shall be entered into the Claims Office's computer data systems. An annual listing of such payments shall be provided to Plaintiffs' Class Counsel for the first three years of the Claims Program and upon request thereafter. In the event of an appeal to the Claims Reviewer, pursuant to Section E.2, payment shall be made within thirty (30) days of receipt by the Claims Office of the Claims Reviewer's decision.

g.    Should the Claims Office disallow any Claim, in whole or in part, for any reason, it shall so notify the Claimant within the time limits described in Section E.2 (c-e *above*) of the Claimant's right to have the Claim reviewed by the Claims Reviewer. Within sixty (60) days after the mailing of a notice of disallowance from Defendant, properly addressed to the mailing address supplied in the Claim for Existing Damage or Claim for Unreimbursed Repair and postage prepaid, a Claimant may file with the Claims Reviewer a written request (Exhibit "E" hereto) for the Claims Reviewer to review the disallowance or other payment determination. If no such request is timely made, then Defendants' determination of the Claim shall be final. If a Claim is denied because the Claimant's shingles were not manufactured by GAF, the Claims Office shall serve on Plaintiffs' Counsel a copy of the letter advising the Claimant of the denial, and upon request of Plaintiffs' Counsel, shall forward a copy of the claim file to Plaintiffs' Counsel, and shall allow Plaintiffs' Counsel to inspect any samples of the Claimant's shingles.

h.    In its discretion, the Claims Reviewer may request an inspection at a Claimant's Property by the Independent Inspector. Any inspection by the Independent Inspector shall be completed as soon as practicable, but no later than forty-five (45) days after the Claims Reviewer makes a request for inspection on the Inspector. The inspection by the Independent Inspector may include the following:

-18-

(1)     A determination as to whether the structure is shingled with GAF Shingles;

(2)     A determination of the approximate Date of Installation of GAF Shingles on the structure or home;

(3)     A determination as to whether the GAF Shingles have sustained Damage and the extent thereof; or

(4)     Any other determination requested by the Claims Reviewer.

i.      Promptly after completion of the inspection, the Independent Inspector will forward a completed Field Inspection Report (in a form to be mutually agreed upon by the parties) for each Claim inspected to the Claims Office, to the Claimant and to the Claims Reviewer.

j.      The Claims Reviewer shall provide Defendant and the Claimant forty-five (45) days to submit any additional materials they believe should be considered by the Claims Reviewer.  After the expiration of the forty-five (45) day period for the submission of additional materials, the Claims Reviewer shall be authorized to make a final, binding and non-appealable determination as to whether, and in what amount, any Claim should be paid by Defendant pursuant to Section E.3, based on the information in the Claim files or otherwise obtained from Defendant, the Claimant or the Independent Inspector.  The Claims Reviewer shall notify the Claimant and Defendant of its decision in writing.

k.      Costs for the Claims Review - Claims involving 100 squares or less:

(1)     If the Claims Reviewer determines that GAF improperly denied a Claim, or improperly determined the amount of compensation due a Claimant, GAF shall pay the fees of the Claims Reviewer and the Independent Inspector (if an inspection is conducted) in the amounts of $ _____ and $ _____, respectively.

-19-

(2)     Except as provided in Subparagraph (k)(3) below, Claimants who seek

review of their Claim shall not be required to pay any money up front for the costs of a Claim

Review.   However, if the Claimant loses the appeal (i.e., if the Claims Reviewer affirms the

determination made by the Claims Office), the Claimant shall be required to pay the fees of the

Claims Reviewer and the Independent Inspector (if an inspection is conducted) in the amounts of

$ _____ and $ _____, respectively.   Where appropriate, the charges shall be deducted from any

compensation otherwise payable under the Agreement to such an Eligible Claimant.

(3)     Claimants who seek review of a determination that their shingles are not

GAF Shingles may request a review by the Claims Reviewer of such a determination; provided,

however, that such Claimants must pay in advance the cost of the review and inspection (if an

inspection is conducted) in the amounts of $ _____ and $ _____, respectively.  If the Claims Reviewer

determines that the Claimant is, in fact, an Eligible Claimant entitled to compensation under the

Agreement, the Claimant's cash advance shall be returned, and GAF shall pay the full costs of the

review and inspection (if an inspection is conducted) in the amounts set forth above.

Costs for the Claims Review – Claims involving more than 100 squares:

(1)     If the Claims Reviewer determines that GAF improperly denied a Claim,

or improperly determined the amount of compensation due a Claimant, GAF shall pay the fees of

the Claims Reviewer and the Independent Inspector (if an inspection is conducted) in the

amounts of $ _____ and $ _____, respectively.

(2)     Claimants who seek review of a determination that their shingles are not

GAF Shingles or contend that GAF improperly denied their claim or improperly determined the

amount of compensation due may request a review by the Claims Reviewer of such a determination;

provided, however, that such Claimants must pay in advance the cost of the review and inspection

(if an inspection is conducted) in the amounts of $ _____ and $ _____, respectively.   If the Claims

Reviewer determines that the Claimant is, in fact, an Eligible Claimant entitled to compensation under the Agreement, the Claimant's cash advance shall be returned, and GAF shall pay the full costs of the review and inspection (if an inspection is conducted) in the amounts set forth above.

l.      The Parties shall jointly propose a Claims Reviewer to be appointed by the Court to preside over implementation of the Settlement Agreement and to resolve certain disputes. The Parties will use their best efforts to agree on the Claims Reviewer to be proposed to the Court.

m.      There will be an expedited claims procedure for Class Members who have listed, posted or advertised their home or structure for sale or who are experiencing significant water intrusion into their homes.

n.      With respect to any Settlement Class Member and for the term of this Settlement, all applicable statutes of limitation and repose shall be tolled, and GAF shall waive all legal and factual defenses not specifically preserved herein, including but not limited to, the defenses of lack of privity, the limitation of recovery of "economic loss," lack of reliance, that a Class Member purchased his/her Property "as is," the absence of a defect in material or workmanship in GAF Shingles, and/or any other legal defenses not specifically reserved in this Agreement; provided, however, that this waiver shall not apply to any claims for Consequential Damages, any claims asserted by a non-Settlement Class Member or by any person who "opts out" of the Settlement Class, and that as to a Settlement Class Member, GAF retains the defenses that the Claimant's shingles are not GAF Shingles, the Claimant's GAF Shingles are not Damaged or that the principal cause of the Damage is or was due to one or more of the listed Causation Exceptions.

o.      Any Claimant who is a Subsequent Owner of Property may file a Claim to the extent such Damaged Shingles have not previously been the subject of a claim filed by his or her predecessor. Any dispute concerning the validity of any payment to or claim by a subsequent purchaser will be resolved by the Claims Reviewer. Under no circumstances shall Defendant be

-20-

applicable Claim Period shall be compensated as follows:

Claim for Damage during the applicable Claim Period. All Claims for Damage during the

Any Eligible Claimant with GAF Shingles that meets the definition of "Damage" may file a

3.    **Compensation: Claims for Damage**

related to Damage, as defined herein, are released by this Settlement Agreement.

this Agreement, Defendant retains all of its legal and factual defenses. Only claims arising from or

covered by this Agreement. With respect to any claim or action for shingle damage not covered by

rights of a Settlement Class member to pursue a claim or action for shingle damage that is not

s.    Nothing in this Agreement shall prejudice or in any way interfere with the

Eligible Claimant prior to the Settlement Date.

r.    Nothing herein shall require Defendant to make any payments to any

employees.

Claims Reviewer, Notice Administrator, Independent Inspector or their respective agents or

or Plaintiffs' Class Counsel have any liability for claims of wrongful or negligent conduct by the

q.    In no event shall Defendant, any attorneys representing Defendant, Plaintiffs

may submit additional Claims within the Claims Period with respect to the additional Damage.

Compensable Damage to such additional, uncompensated-for roof planes, such Eligible Claimant

roof have not suffered Compensable Damage, but the Eligible Claimant suffers additional

Property is roofed with more than 100 squares of GAF Shingles because one or more planes of the

p.    In the event Defendant does not compensate an Eligible Claimant whose

will pay -- if compensation is due under this Agreement -- the first Eligible Claimant to file a Claim.

relating to the same GAF Shingles on the same Property. In the event of multiple claims, Defendant

required to compensate more than one Person (or the same Person more than one time) for Damage

a.    **GAF Organic Shingles Manufactured From January 1, 1973 until December 31, 1984**

(1)    Original Owners shall have the option to elect one of the following three alternative forms of compensation and to receive either:

(i)    "**Cash & Materials Option**": labor in the amount of $80 per square for Damaged GAF organic laminated shingles, or $70 per square for Damaged GAF organic strip shingles, which amount shall be Pro-Rated; plus materials consisting of an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; or

(ii)    "**All-Cash Option**": labor in the amount of $80 per square for Damaged GAF organic laminated shingles, or $70 per square for Damaged GAF organic strip shingles, which amount shall be Pro-Rated; plus an additional cash substitute for the materials component referred to in (i) above for Damaged organic roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration; or

(iii)    "**Materials-Only Option**": roofing shingles, consisting of fiberglass roofing shingles of a similar type and equivalent warranty term, in an amount equal to the total number of Damaged squares of

-22-

-23-

GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; plus an additional amount of fiberglass shingles at a reduced cost (in accordance with Schedule C attached hereto) substituted for all or part of the Pro-Rated labor dollar component referred to in (i)-(ii) above. Any Person selecting this option shall be permitted to purchase upgraded materials at a reduced cost in accordance with Schedule C attached hereto.

(2)    Subsequent owners who purchased Property during the first 7 years of the original warranty period shall have the option to elect and receive one of the three alternate forms of compensation referred to in E.3(a)(1)(i)-(iii) above, but subject to the following schedule with respect to the labor component:

| DATE SUBSEQUENT OWNER PURCHASED PROPERTY | PERCENTAGE OF LABOR CALCULATED IN SECTION (a)(1)(i)-(iii) ABOVE |
| --- | --- |
| During Year 1 and 2 of the Original Warranty Period | 100% |
| During Year 3 of the Original Warranty Period | 85% |
| During Year 4 of the Original Warranty Period | 70% |
| During Year 5 of the Original Warranty Period | 55% |
| During Year 6 of the Original Warranty Period | 40% |
| During Year 7 of the Original Warranty Period | 25% |
| After Year 7 of the Original Warranty Period | 0% |

(3)    Subsequent Owners who did not purchase Property during the first 7 years of the original warranty period, shall have the option to select, throughout the remainder of the original warranty period, one of the following two alternative forms of compensation and to receive:

-24-

(i)    "Materials-Only Option": an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated. Any Person selecting this option shall be permitted to purchase additional materials at a reduced cost in accordance with Schedule C attached hereto; or

(ii)    "All-Cash Option": a cash substitute for the materials referred to in (i) above for Damaged organic roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration.

b.    **GAF Fiberglass Shingles Manufactured From January 1, 1976 until December 31, 1989**

(1)    Original Owners shall have the option to elect one of the following three alternative forms of compensation and to receive either:

(i)    "Cash & Materials Option": labor in the amount of $61 per square for Damaged GAF fiberglass laminated shingles, or $54 per square for Damaged GAF fiberglass strip shingles, which amount shall be Pro-Rated; plus materials consisting of an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged

-25-

squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; or

    (ii) **"All-Cash Option"**: labor in the amount of $61 per square for Damaged GAF fiberglass laminated shingles, or $54 per square for Damaged GAF fiberglass strip shingles, which amount shall be Pro-Rated; plus an additional cash substitute for the materials referred to in (i) above for Damaged fiberglass roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration; or

    (iii) **"Materials-Only Option"**: roofing shingles, consisting of fiberglass roofing shingles of a similar type and equivalent warranty term, in an amount equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; plus an additional amount of fiberglass shingles at a reduced cost (in accordance with Schedule C attached hereto) substituted for all or part of the Pro-Rated labor dollar component referred to in (i)-(ii) above. Any Person selecting this option shall be permitted to purchase upgraded materials at a reduced cost in accordance with Schedule C, attached hereto.

-26-

(2)    Subsequent owners who purchased Property during the first 7 years of the original warranty period shall have the option to elect and receive one of the three alternate forms of compensation referred to in E.3(b)(1)(i)-(iii) above, but subject to the following schedule with respect to the labor component:

| DATE SUBSEQUENT OWNER PURCHASED PROPERTY | PERCENTAGE OF LABOR CALCULATED IN SECTION (b)(1)(i)-(iii) ABOVE |
|---|---|
| Year 1 and 2 of the Original Warranty Period | 100% |
| Year 3 of the Original Warranty Period | 85% |
| Year 4 of the Original Warranty Period | 70% |
| Year 5 of the Original Warranty Period | 55% |
| Year 6 of the Original Warranty Period | 40% |
| Year 7 of the Original Warranty Period | 25% |
| After Year 7 of the Original Warranty Period | 0% |

(3)    Subsequent Owners who did not purchase Property during the first 7 years of the original warranty period, shall have the option to select, throughout the remainder of the original warranty period, one of the following two alternative forms of compensation and to receive:

(i)    "Materials-Only Option": an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated. Any Person selecting this option shall be permitted to purchase additional materials at a reduced cost in accordance with Schedule C, attached hereto; or

(ii)    **"All-Cash Option"**: a cash substitute for the materials referred to in (i) above for Damaged fiberglass roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration.

c.    **GAF Fiberglass Shingles Manufactured From January 1, 1990 until December 31, 1997**

(1)    Original Owners shall have the option to elect one of the following three alternative forms of compensation and to receive either:

(i)    **"Cash & Materials Option"**: labor in the amount of the Replacement Labor Cost per square for Damaged GAF fiberglass laminated shingles, or the Replacement Labor Cost per square for Damaged GAF fiberglass strip shingles, which amount shall be Pro-Rated; plus materials consisting of an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; or

(ii)    **"All-Cash Option"**: labor in the amount of the Replacement Labor Cost per square for Damaged GAF fiberglass laminated shingles, or the Replacement Labor Cost per square for Damaged fiberglass strip shingles, which amount shall be Pro-Rated; plus an additional cash substitute for the materials referred to in (i) above

for Damaged fiberglass roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration; or

(iii) "**Materials-Only Option**": roofing shingles, consisting of fiberglass roofing shingles of a similar type and equivalent warranty term, in an amount equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated; plus an additional amount of fiberglass shingles at a reduced cost (in accordance with Schedule C attached hereto) substituted for all or part of the Pro-Rated Replacement Labor Cost component referred to in (i)-(ii) above. Any Person selecting this option shall be permitted to purchase upgraded materials at a reduced cost in accordance with Schedule C, attached hereto.

(2)      Subsequent owners who purchased Property during the first 7 years of the original warranty period shall have the option to elect and receive one of the three alternate forms of compensation referred to in E.3(c)(1)(i)-(iii) above, but subject to the following schedule with respect to the Replacement Labor Cost component:

| DATE SUBSEQUENT OWNER PURCHASED PROPERTY | PERCENTAGE OF REPLACEMENT LABOR COST CALCULATED IN SECTION (e)(1)(i)-(iii) ABOVE |
| --- | --- |
| Year 1 and 2 of the Original Warranty Period | 100% |
| Year 3 of the Original Warranty Period | 85% |
| Year 4 of the Original Warranty Period | 70% |

-28-

-29-

| Year 5 of the Original Warranty Period | 55% |
| Year 6 of the Original Warranty Period | 40% |
| Year 7 of the Original Warranty Period | 25% |
| After Year 7 of the Original Warranty Period | 0% |

(3)    Subsequent Owners who did not purchase Property during the first 7 years of the original warranty period, shall have the option to select, throughout the remainder of the original warranty period, one of the following two alternative forms of compensation and to receive:

(i)    **"Materials-Only Option":**    an amount of squares (consisting of fiberglass roofing shingles of a similar type and equivalent warranty term) equal to the total number of Damaged squares of GAF Shingles on Claimant's Property, which amount shall be Pro-Rated. Any Person selecting this option shall be permitted to purchase additional materials at a reduced cost in accordance with Schedule C attached hereto; or

(ii)    **"All-Cash Option":**    a cash substitute for the materials referred to in (i) above for Damaged fiberglass roofing shingles of a similar type and equivalent warranty term, as set forth in Schedule B attached hereto, which amount shall be Pro-Rated, and subject to a limitation that this cash option is available only for claims of two hundred (200) squares or less after applicable Pro-Ration.

4.    **Compensation:  Claims For Unreimbursed Expenditures.**

Eligible Claimants who file a Claim for Unreimbursed Repair shall be paid the lesser of the dollar amount of such Unreimbursed Repair or the amount to which they would have been

-30-

entitled by application of the Compensation Formula set forth herein calculated as of the date of

repair.

5.    **Inflation Adjustment**

Four (4) years after the Settlement Date, the "labor" and "cash" components set forth

above shall be adjusted for inflation. Every two (2) years thereafter (i.e., six years, eight years,

ten years after the Settlement Date), the "labor" and "cash" components set forth above shall

again be adjusted for inflation. The rate of inflation shall be based on R.S. Means and shall be

capped at an aggregate 8% for the first four year term and an aggregate 4% for every two year

term thereafter.

6.      **Miscellaneous Claims Issues**

a.      **Claims for Consequential Damages**

Eligible Claimants' claims for Damage to GAF Shingles are governed exclusively by the terms of this Agreement. Claims for Consequential Damages are not released by the terms of this Agreement, and by filing a Claim in the Claims Program, a Settlement Class Member does not release or prejudice his/her right to seek recovery for any Consequential Damages outside the context of this Settlement and the Claims Program. Where Consequential Damages are sought, the Parties agree that Settlement Class Members shall be limited to compensatory damages only. Settlement Class Members may not seek penalties, punitive damages, exemplary damages, damages based upon a multiplication of compensatory damages, or attorney fees in connection with any claim for Consequential Damages. Defendant retains all legal and factual defenses to any claim for Consequential Damages.

b.      **Exclusive Remedy.**

Except as provided in Section E.6.a, *above*, with respect to claims for Consequential Damages, the Claims Program provided in the Settlement shall constitute the sole and exclusive remedy for any and all claims of Settlement Class Members for any Damage related to GAF Shingles. The Claims Reviewer may provide only the compensatory relief provided for by this Agreement, and may not award punitive or multiple damages with respect to any claim governed by this Agreement. Upon the entry of the Final Order and Judgment by the Court, each Settlement Class Member shall be barred from initiating, asserting, or prosecuting any claim for any Damage relating to GAF Shingles, except in accordance with the terms of this Agreement.

F.      **NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

1.      As the Court may direct, the Parties shall cause the Notice of Proposed Class Action Settlement describing this proposed Settlement Agreement and the Fairness Hearing to be

-31-

provided to the members of the Class as provided in this Section and in accordance with the Notice Plan or as otherwise approved or directed by the Court.

2.     The mailed Notice, in a form substantially in the form of attached Exhibit "D," and approved by the Court, shall be mailed, first class postage prepaid, to each member of the Class identified by the Parties through reasonable efforts. In addition, such mailing shall be sent to each member of the Class whose identity becomes known as a result of the Notice of Proposed Class Action Settlement being published, and other subsequent mailings will be made as the identities or addresses of additional Class Members become known.

3.     No later than the Initial Notice Date, the Notice Administrator shall cause a nationwide toll-free telephone facility to be established. The telephone facility shall be capable of: (1) receiving requests for the long form of the Notice of Proposed Class Action Settlement and other materials described in this Section; (2) providing generalized information concerning deadlines for opt-outs, proofs of claim, and presentations to the Court at the Fairness Hearing; and (c) mailing the materials to Class Members as provided in this Paragraph.

4.     The Class Notice shall be published in a manner reasonably calculated to reach Settlement Class Members and as otherwise approved or directed by the Court.

5.     The Notice Administrator shall, under the supervision of the Court, establish and maintain the toll-free number and answering system (including live operators to the extent deemed necessary by mutual agreement of Plaintiffs' Class Counsel and Defendant), and shall mail the Class Notice, Claim for Existing Damage, Claim for Unreimbursed Repair and Request for Exclusion form to anyone who requests a copy. The Notice Administrator shall maintain the records of its activities, including logs of all telephone calls, and a running tally of the number of Notice packages mailed, in computerized database form and shall provide such periodic and

special reports and such other information as the Court, Plaintiffs' Class Counsel, and/or Defendant may reasonably request. Plaintiffs' Class Counsel and Defendant shall have the right to independently audit any work of the Notice Administrator.

**G.    SETTLEMENT CLASS MEMBERS' RIGHT OF EXCLUSION/INCLUSION**

1.    A Settlement Class Member may opt out of the Settlement Class during the Opt-Out Period. To exercise the opt out right set forth in this Section, the Settlement Class Member must complete, sign, and return a request for exclusion in the form of Exhibit "F," attached to this Agreement. The request must be signed by the Settlement Class Member and notarized and must state the address of the Settlement Class Member's Property(ies) which contain GAF Shingles and the number of units of residential Property or commercial structures containing the Shingles. Such request must be postmarked on or before the end of the Opt-Out Period, which shall be sixty (60) days from the date of the Order of Notice of Proposed Class Action Settlement.

2.    Except for those Settlement Class Members who have properly opted out, all Settlement Class Members will be deemed Settlement Class Members for all purposes under this Agreement. Any Settlement Class Member who elects to opt out of the Settlement Class pursuant to this Section shall not be entitled to relief under or be affected by this Agreement.

3.    Any Class Member who does not file a timely written request for exclusion shall be bound by this Settlement and by all subsequent proceedings, orders and judgments in the Action.

4.    Former Settlement Class Members who previously elected to opt out of the Settlement Class may withdraw their opt out requests only if they accept the benefits and terms of this Agreement and dismiss with prejudice any other pending action or proceeding against the

-33-

Defendant, arising from damage to Settlement Class Members' homes or other structures because

of any defects or alleged defects in GAF Shingles.

5.      In the event that the number of Class Members requesting exclusion reaches a

level that threatens to frustrate the essential purpose of this Agreement, Defendants may elect to

terminate this Agreement by so notifying Plaintiffs' Class Counsel and the Court, not more than

ten (10) days after receipt from the Notice Administrator of the number of valid opt outs

following expiration of the Opt-Out Period.  The number of timely and valid opt outs at which

this election arises has been agreed by the Parties, shall be submitted to the Court under seal, and

shall remain confidential.  Plaintiffs' Class Counsel shall have the right to contact Persons who

file exclusion requests and to challenge the timeliness and validity of any exclusion request, as

well as the right to effectuate the withdrawal of any exclusion filed in error and any exclusion

which a present or former Class Member wishes to withdraw for purposes of participating in the

settlement as set forth in this Agreement.  The Court shall determine whether any of the contested

opt outs is valid.

**H.      EXCLUSIVE REMEDY; DISMISSAL OF ACTION; JURISDICTION OF COURT**

1.      Each and every member of the Settlement Class who has not requested exclusion

pursuant to Section G submits to the jurisdiction of the Court and will be bound by the terms of

this Agreement (including, without limitation, any and all releases), conditioned upon the

occurrence of the Settlement Date, as well as any other Court orders including, without limitation,

the Final Order and Judgment barring further litigation against the Defendant with respect to any

of the Settled Claims.

2.      This Agreement shall be the sole and exclusive remedy for any and all Settled

Claims of Settlement Class Members against Defendant arising from or related to the installation

-34-

and incorporation of GAF Shingles, and upon entry of the Final Order and Judgment by the Court, each Settlement Class Member who has not opted out of the Settlement Class, shall be barred from initiating, asserting, or prosecuting any Settled Claims against Defendant.

3.  Settlement Class Members agree to the dismissal of any action or proceeding pending against the Defendant to the extent any such action or proceeding seeks recovery for any Settled Claims.

4.  Upon the entry of the Final Order and Judgment, this Action and all claims and allegations therein will be dismissed with prejudice.

5.  The Court shall retain exclusive and continuing jurisdiction over the Action, the Parties and Settlement Class Members, to interpret and enforce the terms, conditions, and obligations of this Agreement.

## I.    RELEASES

1.  Upon entry of the Final Order and Judgment, and subject to Section H, *above*, each Settlement Class Member who has not timely opted out of the Settlement Class, on behalf of himself and any Person claiming by or through him (the "Releasing Party"), regardless of whether any Settlement Class Member executes and delivers a written release, shall be deemed to and does hereby release and forever discharge Defendant, including its directors, officers, agents, parent companies, sister companies, subsidiaries, affiliates, assigns, suppliers, vendors, distributors, representatives, predecessors, successors in interest, attorneys or other representatives ("Releasees"), of and from any and all Settled Claims and related subrogation claims of the Releasing Party's subrogees or insurance carriers.  Each Releasing Party, upon entry of the Final Order and Judgment, shall be deemed to and does hereby release and discharge each Releasee of and from any and all Settled Claims.  The Releasing Parties shall be deemed to and do hereby

-35-

release and forever discharge any other persons or entities from claims for which Defendant could be liable to any Releasing Parties, arising out of or based on the design, manufacture, advertising, sale, or distribution of the GAF Shingles. The Releasing Parties specifically reserve any and all other claims and causes of action against any and all other persons or entities or parties not to this Agreement.

2.    Nothing in this Agreement shall prejudice or in any way interfere with the rights of the Settlement Class Members and the Defendant to pursue all their rights and remedies against any persons or entities not a party to this Agreement, except those rights and remedies as are released in Paragraph 1, *above*.

**J.    ENFORCEMENT OF AGREEMENT.**

1.    In the event of a breach by the Defendant or a Settlement Class Member under this Agreement, the Court may exercise all equitable powers over the Defendant or the Settlement Class Member to enforce this Agreement and the Final Order and Judgment irrespective of the availability or adequacy of any remedy at law. Such powers include, among others, the power of specific performance, contempt and injunctive relief.

2.    If the Court does not issue the Final Order and Judgment, or in the event the Settlement Date does not occur, Defendant shall bear, in accordance with the terms of this Agreement, the costs of the Notice Plan and any other Administrative Expenses incurred to such point, along with any associated shutdown expenses, including any notices as the Court may direct, and Defendant shall not have the right to recoup such funds, regardless of whether the Court issues the Final Order and Judgment. Plaintiffs' Class Counsel and the Class Members bear no obligation for any costs incurred in connection with implementation of the Notice Plan or for any other expenses incurred by the Defendant.

## K.    REPRESENTATIONS AND WARRANTIES

1.    The Defendant represents and warrants that: (i) it has all requisite corporate

power and authority to execute, deliver, and perform this Agreement and to consummate the

transactions contemplated hereby, (ii) the execution, delivery, and performance of this Agreement

have been duly authorized by all necessary corporate action on the part of Defendant; (iii) its

signatories to the Agreement have full authority to sign on behalf of and to bind Defendant to the

terms of the Agreement, and (iv) this Agreement has been duly and validly executed and delivered

by Defendant and constitutes iis legal, valid and binding obligation.

2.    Plaintiffs' Class Counsel represents and warrants that they are authorized to

execute this Agreement and to bind the Plaintiffs on whose behalf they have executed this

Agreement to all the terms and conditions of this Agreement.

## L.    JUDGMENT

After the Fairness Hearing, and subject to the Court's approval of the Settlement, a Final

Order and Judgment shall be entered,

1.    approving the Settlement as fair, reasonable and adequate and as having

been entered into in good faith; directing the parties to comply with and

implement the terms of the Settlement; and declaring the Settlement

binding on all Settlement Class Members;

2.    confirming that the Notice constitutes the most effective and practicable

notice to Settlement Class Members under the circumstances;

3.    dismissing the Action on the merits and with prejudice, without costs to

any party except as provided in this Settlement;

4.    retaining jurisdiction over the matters provided for in the Settlement.

## M.    TERMINATION OF THE AGREEMENT

-38-

1.      The performance of this Agreement is expressly contingent upon the Court's issuance of the Final Order and Judgment. If the court issues an Order disapproving the Settlement, Defendant may elect to terminate this Agreement within ninety (90) business days of such Order, rendering it as having no force or effect whatsoever, null and void, *ab initio*, and not admissible as evidence for any purpose in any pending or future litigation or other proceeding (in any jurisdiction) involving any of the Parties.

2.      After three (3) years from the Settlement Date, Defendant shall have the unilateral right to terminate this Agreement by giving written notice thereof to Plaintiffs' Class Counsel and the Court if: (1) the cumulative average number of claims submitted through year three of the Claims Program exceeds 150% of the cumulative average number of claims submitted in 1996 and 1997; (2) the cumulative average number of claims submitted through year four of the Claims Program exceeds 130% of the cumulative average number of claims submitted in 1996 and 1997; (3) the cumulative average number of claims submitted through year five of the Claims Program exceeds 110% of the cumulative average number of claims submitted in 1996 and 1997; or (4) the cumulative average number of claims submitted through any subsequent year of the Claims Program exceeds 110% of the cumulative average number of claims submitted in 1996 and 1997. If Defendant exercises its option to terminate the Agreement under this paragraph, then this Agreement shall have no force or effect whatsoever, shall be rendered null and void, *ab initio*, and shall not be admissible as evidence for any purpose in any pending or future litigation or other proceeding (in any jurisdiction) involving any of the Parties.

3.      For five (5) years from the date of this Agreement, Defendant agrees to use reasonable efforts to preserve all records and evidence which would be relevant to, or would reasonably lead to the discovery of relevant evidence, concerning the research and development of

GAF Shingles, their marketing, distribution, and manufacture, and the operation of its warranty claims process.

## N.   MISCELLANEOUS PROVISIONS

1.   <u>Notification to Subsequent Purchasers</u>:   As more particularly specified in Exhibits "A" and "B", attached to this Agreement, each Settlement Class Member is required to sign a statement in connection with the Claim certifying that any proceeds from the Claims Program will be applied to the repair or replacement of the subject GAF Shingles, and if such proceeds are not so applied, agreeing to advise any subsequent purchaser of the Property that a Claim has been made, or to record such Claim in the appropriate title records of the Property and to make such other appropriate disclosure as may be required by local or state laws regarding the purchase and sale of property.   If an Eligible Claimant has not filed a claim or received benefits pursuant to the terms of this Agreement, then a subsequent owner (successor-in-interest or transferee) can file a Claim during the remainder of the applicable Claim Period.   Such Claims will be treated as Claims by Subsequent Owners.   Any Claimant who fails to perform the obligations in this Paragraph shall indemnify and hold harmless Defendant for all payments made to subsequent purchasers of the Property covering the same Damage to the same Shingles on the same Property and acknowledge this obligation as provided in Exhibits "A" and "B."

2.   <u>Limitations of Payments</u>:   Anything in this Agreement to the contrary notwithstanding, under no circumstances shall Defendant be required to compensate more than one Person (or the same Person more than one time) for Damage relating to the same GAF Shingles on the same Property.   In the event of multiple claims, Defendant will pay -- if compensation is due under this Agreement -- the first Eligible Claimant to file a Claim.

3.   <u>Settlement Purposes Only</u>

-39-

a.    This Agreement is for settlement purposes only, and neither the fact of, nor any provision contained in, this Agreement or its Exhibits, nor any action taken hereunder, shall constitute, be construed as, or be admissible in evidence as, any admission of the validity of any claims or any fact alleged by Plaintiffs in this Action or in any pending or subsequently filed action or proceeding or as any admission of wrongdoing, fault, violation of law, or liability of any kind on the part of Defendant or admission by Defendant of any claim or allegation made in this Action or in any action or proceeding.

b.    Any certification of a conditional, preliminary or final Settlement Class pursuant to the terms of this Agreement shall not constitute, and shall not be construed as, an admission on the part of Defendant that this Action, or any other proposed or certified class action, is appropriate for trial class treatment pursuant to Ala.R.Civ.P. 23 or any similar state or federal class action statute or rule.  This Agreement is without prejudice to the rights of Defendant to: (1) oppose final certification in this Action should this Settlement not be approved or implemented for any reason; (2) oppose certification in any other proposed or certified class action; or (3) use the certification of this Settlement Class to oppose certification of any other proposed class arising out of the issues and claims that are asserted herein.

4.    Other

a.    Subject to Court approval, Defendant shall pay, in addition to any recovery by such Plaintiff as a Claimant in the Claims Program, to each Class Representative (or married couple) in this Action, one payment of $5,000 on the Settlement Date.

b.    Should any provision of this Agreement, or any of the Exhibits thereto, require judicial interpretation, the Parties agree that the Court or other adjudicating body shall not apply a presumption that the terms shall be more strictly construed against the party who prepared

-41-

this Agreement, it being agreed that all Parties collectively participated in the negotiation and preparation of this Agreement and its Exhibits.

c.    This Agreement shall be construed under and governed by the laws of the State of Alabama, applied without regard to its choice of law provisions.

d.    Plaintiffs' Class Counsel have taken substantial discovery, including depositions of the Defendant's personnel with responsibility for claims processing and manufacture of Shingles.

e.    This Agreement, including all attached Exhibits hereto, shall constitute the entire Agreement among the Parties with regard to the subject matter of this Agreement and shall supersede any previous agreements and understandings between the Parties. This Agreement may not be changed, modified, or amended except in writing signed by Plaintiffs' Class Counsel and Defendant's counsel and subject to Court approval. The Parties contemplate that the Exhibits may be modified by subsequent agreement of Plaintiffs' Class Counsel and Defendant's Counsel prior to dissemination to the Settlement Class Members.

f.    This Agreement may be executed by the Parties in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.

g.    Subject to the limitations and conditions expressly provided herein, this Agreement shall be binding upon and inure to the benefit of the Settlement Class, the Parties, and their representatives, heirs, successors, and assigns.

h.    The headings of the Sections of this Agreement are included for convenience only and shall not be deemed to constitute part of this Agreement or to affect its

-42-

construction. References to a "Section" includes reference to all paragraphs within the referenced Section.

i. Any notice, instruction, application for Court approval or application for Court order sought in connection with this Agreement or other document to be given by any Party to any other Party shall be in writing and delivered personally or by facsimile followed by overnight mail, to the following representatives of the Parties:

FOR DEFENDANT:

**Andrew T. Berry, Esquire**
*McCARTER & ENGLISH*
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

**Edward Sledge, Esquire**
McDOWELL, KNIGHT, ROEDDER
& SLEDGE
Post Office Box 350
Mobile, Alabama 36601

FOR PLAINTIFFS:

**Kenneth G. Gilman, Esquire**
*GILMAN AND PASTOR, LLP*
One Boston Place, 28th Floor
Boston, Massachusetts 02108

**James Yance, Esquire**
**Richard T. Dorman, Esquire**
*CUNNINGHAM, BOUNDS, YANCE,*
*CROWDER AND BROWN*
1601 Dauphin Street
Mobile, AL 36604

j. Except as otherwise provided in this Agreement, any filing, submission, Claim, notice or written communication shall be deemed filed, delivered, submitted or effective as of the date of its postmark when mailed first class, registered or certified mail, postage prepaid, properly addressed to the recipient, or when delivered to any commercial one- or two-day delivery service properly addressed to the recipient, or when actually received by the recipient, whichever first occurs.

day delivery service properly addressed to the recipient, or when actually received by the recipient, whichever first occurs.

DATED this 24th day of September, 1998.

**FOR THE DEFENDANT:**

By: _____
Executive Vice President &
General Counsel
GAF BUILDING MATERIALS CORP.

By: _____
Executive Vice President &
General Counsel
GAF MATERIALS CORP.

Andrew T. Berry
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

**FOR THE PLAINTIFF SETTLEMENT CLASS:**

Kenneth G. Gilman
GILMAN AND PASTOR, LLP
One Boston Place, 28th Floor
Boston, Massachusetts 02108

James Yance
CUNNINGHAM, BOUNDS, YANCE,
CROWDER AND BROWN
1601 Dauphin Street
Mobile, Alabama 36604

-42-

NWKI: 448791.02

-43-

DATED this _____ day of September, 1998.

**FOR THE DEFENDANT:**

By: _____

Title: _____

_____
Andrew T. Berry
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

**FOR THE PLAINTIFF SETTLEMENT CLASS:**

_____ , III
John W. Sharbrough, III
THE SHARBROUGH LAW FIRM
Post Office Box 996
Mobile, Alabama 36601-0996

Kenneth G. Gilman
GILMAN & PASTOR, LLP
One Boston Place
28th Floor
Boston, Massachusetts 02108

Richard T. Dorman
CUNNINGHAM, BOUNDS, YANCE,
CROWDER & BROWN
1601 Dauphin Street
Mobile, Alabama 36604

James C. Johnston
JOHNSTON, WILKINS & DRUHAN
Post Office Box 154
Mobile, Alabama 36601

David J. Guin
DONALDSON, GUIN & SLATE, L.L.C.
The Morgan Keegan Center
2900 Highway 280, Suite 230
Birmingham, Alabama 35223

John W. Coleman
103 Dauphin Street
Mobile, Alabama 36602

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

| | | |
|---|---|---|
| PENNY COLEMAN, JEX R. and ANN H. | ( | |
| LUCE, JR. , EDWARD and LUCIAN S. (POPPY) | ( | |
| FIELDS, EDWARD R. DILLON and JOCELYN | ( | |
| EDELSTON, individually and on behalf of a class | ( | |
| of similarly situated persons, | ( | |
| | ( | |
| Plaintiffs, | ( | |
| | ( | |
| vs. | ( | Civil Action Number: |
| | ( | |
| GAF BUILDING MATERIALS CORPORATION, | ( | CV-96-0954-GALANOS |
| | ( | |
| Defendant. | ( | CLASS ACTION |
| | ( | |

## AMENDMENT TO THE SETTLEMENT AGREEMENT

THIS AMENDMENT TO THE SETTLEMENT AGREEMENT ("Amendment") is entered

into this _____ day of February, 1999, by and among: (1) the Plaintiffs in the above litigation, for

themselves and on behalf of the Settlement Class as that term is defined in the September 24, 1998

Settlement Agreement ("Plaintiffs"); (2) the Plaintiff Intervenors in the above litigation ("Plaintiff

Intervenors"); and (3) Defendant GAF Building Materials Corporation as defined in the September

24, 1998 Settlement Agreement ("Defendant" or "GAF").

### BACKGROUND

The Plaintiffs and GAF entered into a Settlement Agreement on September 24, 1998. On

September 28, 1998, the Circuit Court of Mobile County, Alabama conditionally certified a

national settlement class and preliminarily approved the settlement.   On October 21, 1998,

October 26, 1998 and January 14, 1999, Plaintiff Intervenors moved to intervene in this action

for the purpose of objecting to portions of the Settlement Agreement (Plaintiff Intervenor Leon

Fassler is represented by Bernstein Litowitz Berger & Grossmann LLP, Fitzsimmons Ringle & Jacobs PC and The Stewart Law Firm PC; Plaintiff Intervenor James McKaige is represented by Milberg Weiss Bershad Hynes & Lerach LLP, Goldstein Litle & DePalma LLC, Bonnet Fairbourn Friedman & Balint PC and Miller Hamilton Snider & Odom LLC; and Plaintiffs Robert and Kathleen Carr are represented by George M. Fleming & Associates LLP). On January 11, 1999 and March 8, 1999, the Court granted the various motions to intervene. The purpose of this Amendment is to make various changes to the Settlement Agreement in order to address various objections raised by the Plaintiff Intervenors. These changes were the result of arms-length negotiations between representatives of the Defendant and Plaintiff Intervenors.

## AGREEMENT

Subject to Court approval as required by the Alabama Rules of Civil Procedure, it is hereby stipulated and agreed that the Settlement Agreement be amended as follows:

### 1.   A.   DEFINITIONS

All definitions herein shall have the same meaning and definition as set forth in the Settlement Agreement except as specifically stated herein.

### 2.   A.   DEFINITIONS – ATTORNEYS FEES

**Attorneys Fees for Plaintiffs' Class Counsel** means the amount awarded by the Court as compensation for the services provided by Plaintiffs' Class Counsel, including reimbursement of costs and expenses (including expert witness fees and expenses), which is not to exceed $4,125 million.  The Attorneys Fees shall be paid in addition to, and shall not be a reduction of, the Replacement Compensation payable to Eligible Claimants pursuant to this Agreement.  The amount of Attorneys Fees approved by the court shall include simple interest computed at the rate of 4% per

-3-

annum, commencing upon September 1, 1999 and continuing until the date on which such

Attorneys Fees are actually paid. Attorneys Fees are payable on the Settlement Date.

**Attorneys Fees for Plaintiff Intervenors' Counsel** means the sum of $1 million that

Defendant has agreed to pay, subject to Court approval, as compensation for the services provided

by Plaintiff Intervenors' Counsel, including reimbursement of costs and expenses (including expert

witness fees and expenses). The Attorneys Fees for Plaintiff Intervenors' Counsel shall be paid in

addition to, and shall not be a reduction of, the Replacement Compensation payable to Eligible

Claimants pursuant to this Agreement. Attorneys Fees are payable on the Settlement Date.

**3.   E.   CLAIMS PROGRAM**

Section E(2)(c) is changed to read as follows:

c.      The Claims Office shall initially determine whether the Claim for Existing Damage

or Claim for Unreimbursed Repair submitted by the Claimant is sufficiently complete for

processing. If information relevant to the Claim for Existing Damage or Claim for Unreimbursed

Repair is incomplete, the Claims Office shall request such additional information from the Claimant

as necessary for processing the Claim. Any such request for additional information must be mailed

to the Claimant within forty-five (45) days after actual receipt of the Claim for Existing Damage or

Claim for Unreimbursed Repair by the Defendant. If no additional information is sought from the

Claimant during this forty-five (45) day period, the Claim shall be deemed "complete" for

processing. Any Claim for which additional information is requested shall be deemed "complete"

for processing upon the earlier of receipt by the Claims Office of the requested information or a

reasonable substitute therefor, or upon the determination by the Claims Reviewer that the Claimant

has provided sufficient information to process the Claim. If a Claimant fails to furnish such

additional information after Defendant's request, the Defendant shall not be required to pay the

-4-

Claimant compensation under the Claims Program, until such information is provided. Any dispute over the actual or alleged failure of the Claimant to timely furnish such requested information (or the necessity of such information) may be reviewed by the Claims Reviewer upon request of a Claimant.

Section E(2)(e) is changed to read as follows:

e. Within sixty (60) days after a Claim for Existing Damage or Claim for Unreimbursed Repair is deemed complete, the Defendant shall make an initial determination as to whether the Claimant is an Eligible Claimant, shall calculate the Replacement Compensation, if any, due the Eligible Claimant in accordance with the Compensation Formula (as hereinafter set forth in Section E.3), and shall notify the Eligible Claimant by first class mail of the Defendant's determination. Defendant shall also provide an Eligible Claimant with a description of the available compensation options and an Election Form to be completed and executed by the Claimant in a form to be mutually agreed upon by the parties.

Section E(2)(g) is changed to read as follows:

g. Should the Claims Office disallow any Claim, in whole or in part, for any reason, it shall so notify the Claimant within the time limits described in Section E.2 (c-e *above*) of the Claimant's right to have the Claim reviewed by the Claims Reviewer. Within sixty (60) days after the mailing of a notice of disallowance from Defendant, properly addressed to the mailing address supplied in the Claim for Existing Damage or Claim for Unreimbursed Repair and postage prepaid, a Claimant may file with the Claims Reviewer a written request (Exhibit "F" hereto) for the Claims Reviewer to review the disallowance or other payment determination. If no such request is timely made, then Defendants' determination of the Claim shall be final. If a Claim is denied because the Claimant's shingles were not manufactured by GAF, the Claims Office, upon request by Plaintiffs' Counsel,

-5-

shall serve on Plaintiffs' Counsel a copy of the letter advising the Claimant of the denial, and upon request of Plaintiffs' Counsel, shall forward a copy of the claim file to Plaintiffs' Counsel, and shall allow Plaintiffs' Counsel to inspect any samples of the Claimant's shingles.

Section E(2)(j) is changed to read as follows:

j.      The Claims Reviewer shall provide Defendant and the Claimant thirty (30) days to submit any additional materials they believe should be considered by the Claims Reviewer. After the expiration of the thirty (30) day period for the submission of additional materials, the Claims Reviewer shall be authorized to make a final, binding and non-appealable determination as to whether, and in what amount, any Claim should be paid by Defendant pursuant to Section E.3, based on the information in the Claim files or otherwise obtained from Defendant, the Claimant or the Independent Inspector. The Claims Reviewer shall notify the Claimant and Defendant of its decision in writing.

Section E(2)(k) is changed to read as follows:

k.      Costs for the Claims Review - Claims involving 100 squares or less:

(1)      If the Claims Reviewer determines that GAF improperly denied a Claim, or improperly determined the amount of compensation due a Claimant, GAF shall pay the fees of the Claims Reviewer and the Independent Inspector (if an inspection is conducted) in the amounts of $60 and $125, respectively.

(2)      Except as provided in Subparagraph (k)(3) below, Claimants who seek review of their Claim shall not be required to pay any money for the costs of a Claim Review or Independent Inspection (if an inspection is conducted).

(3)      Subject to Subparagraph (k)(5)(below), Claimants who seek review of a determination that their shingles are not GAF Shingles may request a review by the Claims

Reviewer of such a determination; provided, however, that such Claimants must pay in advance the cost of the review in the amount of $60. If the Claims Reviewer determines that the Claimant is, in fact, an eligible Claimant entitled to compensation under the Agreement, the Claimant's cash advance shall be returned, along with an additional $60 for inconvenience and delay, and GAF shall pay the full cost of the Claims Reviewer in the amount set forth above.

(4)    If a Claim is denied on the grounds that the shingle is not a GAF Shingle, GAF will inform the Claimant in writing that they have the right to appeal the decision to the Claims Reviewer and that their cash advance shall be returned, along with an additional $60 for inconvenience and delay, if they are successful on appeal. In addition, if GAF denies a claim on the ground that the shingle is not a GAF Shingle and if the identity of the manufacturer is readily apparent to GAF personnel upon visual inspection of the shingle, then GAF will identify the manufacturer of the shingle and provide that information in writing to the Claimant.

(5)    If the Claims Reviewer determines that GAF has incorrectly determined that a Claimant's shingles were not manufactured by GAF in more than 10% of the cases appealed to the Claims Reviewer in any one year, then for the next two years (at least), no Claimant will be required to pay the $60 cost of review. This waiver of fees, however, is not indefinite. If the Claims Reviewer determines that GAF has correctly determined that a Claimant's shingles were not manufactured by GAF in 90% or more of the cases appealed to the Claims Reviewer in any subsequent two year period, then the provisions of Subparagraph (k)(3)(above) become effective once again.

(6)    If GAF rejects a claim on the grounds that one of the Causation Exceptions applies, but does not conduct an independent inspection of the Property, then GAF will pay the claimant an additional $60 for inconvenience and delay if, and only if: (1) the Claimant appeals

to the Claims Reviewer; (2) the Claims Reviewer conducts an independent inspection of the Property; and (3) the Claims Reviewer determines that GAF's determination was incorrect. In addition, if GAF rejects a claim on the grounds that one of the Causation Exceptions applies, but does not conduct an independent inspection of the Property, then GAF will inform the Claimant in writing that they have the right to appeal the decision to the Claims Reviewer and that they will receive $60 for inconvenience and delay, if they are successful on appeal.

Costs for the Claims Review – Claims involving more than 100 squares:

(1)     If the Claims Reviewer determines that GAF improperly denied a Claim, or improperly determined the amount of compensation due a Claimant, GAF shall pay the fees of the Claims Reviewer and the Independent Inspector (if an inspection is conducted) in the amounts of $90 and $200, plus $50 for each additional structure, respectively.

(2)     Claimants who seek review of a determination that their shingles are not GAF Shingles or contend that GAF improperly denied their claim or improperly determined the amount of compensation due may request a review by the Claims Reviewer of such a determination; provided, however, that such Claimants must pay in advance the cost of the review and inspection (if an inspection is conducted) in the amounts of $90 and $200, plus $50 for each additional structure, respectively. If the Claims Reviewer determines that the Claimant is, in fact, an Eligible Claimant entitled to compensation under the Agreement, the Claimant's cash advance shall be returned, and GAF shall pay the full costs of the review and inspection (if an inspection is conducted) in the amounts set forth above.

4.      F.      NOTICE OF PROPOSED CLASS ACTION SETTLEMENT

The following additions are made to the Settlement Agreement:

6.      GAF agrees to write and disseminate a news story reminding consumers about the

benefits available under the Coleman Settlement in years 1, 4, 7 and 10 of the claims period. This news story will be disseminated through the following news services: NAPS and US 1 Newsline, which will contain GAF's product web site address and toll-free number.

7.    As part of GAF's product web site, GAF will provide information on how to file a claim for enhanced benefits.

5.    **M.  TERMINATION OF THE AGREEMENT**

Section M(2) is changed to read as follows:

2.    After three (3) years from the Settlement Date, Defendant shall have the unilateral right to terminate this Agreement by giving written notice thereof to Plaintiffs' Class Counsel and the Court if: (1) the cumulative average number of claims paid through year three of the Claims Program exceeds 250% of the cumulative average number of claims paid in 1996 and 1997; or (2) the cumulative average number of claims paid in any subsequent year of the Claims Program exceeds 250% of the cumulative average number of claims paid in 1996 and 1997. If Defendant exercises its option to terminate the Agreement under this paragraph, then this Agreement shall have no force or effect whatsoever, shall be rendered null and void, *ab initio*, and shall not be admissible as evidence for any purpose in any pending or future litigation or other proceeding (in any jurisdiction) involving any of the Parties.    If Defendant exercises its option to terminate the Agreement under this paragraph, then Defendant will notify every Claimant who files a Claim that the Settlement Agreement has been terminated and that their Claims are governed by the warranty applicable to their shingles.

Section M(3) is changed to read as follows:

3.    Defendant agrees to use reasonable efforts to preserve all records and evidence which would be relevant to, or would reasonably lead to the discovery of relevant evidence,

concerning the research and development of GAF Shingles, their marketing, distribution, and manufacture and the operation of its warranty claims process. If GAF no longer preserves such records and evidence, then GAF will provide notice of this fact to Plaintiffs' Counsel and will have waived its unilateral right to terminate this Settlement Agreement pursuant to Section M(2) above.

6.    N.    MISCELLANEOUS PROVISIONS

The following additions are made to the Settlement Agreement:

5.    Yearly Report: At the end of each year of the Claims Program, GAF will make available to Plaintiffs' Counsel or Plaintiff Intervenors' Counsel (upon request) a yearly report identifying: (1) the number of claims filed in that calendar year; (2) the number of claims paid in that calendar year; (3) the number of claims denied in that calendar year; (4) the total compensation paid in that calendar year; (5) the number of claimants appealing to the Claims Reviewer in that calendar year; and (6) the number of claimants who are successful on appeal to the Claims Reviewer in that calendar year.

6.    Opt-Outs: Opt-outs filed on or before February 22, 1999 shall be recognized.

7.    BINDING EFFECT

Except for the amendments set forth herein, all other terms and conditions of the Settlement Agreement shall remain in full force and effect without modification.

-10-

**8.    COUNTERPARTS.**

This Amendment to the Settlement Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

DATED this _____ day of February, 1999.

**FOR THE DEFENDANT:**

By: _____          By: _____
Executive Vice President &               Executive Vice President &
General Counsel                          General Counsel
GAF BUILDING MATERIALS CORP.             GAF MATERIALS CORP.

_____
Andrew T. Berry
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

**FOR THE PLAINTIFF SETTLEMENT CLASS:**

_____          _____
Kenneth G. Gilman                   James Vance
GILMAN AND PASTOR, LLP              CUNNINGHAM, BOUNDS, YANCE,
One Boston Place, 28th Floor         CROWDER AND BROWN
Boston, Massachusetts 02108         1601 Dauphin Street
                                    Mobile, Alabama 36604

-11-

**FOR THE PLAINTIFF INTERVENORS:**

[signature] Doug/05, 14/14/Ke;5L

Max W. Berger
Douglas M. McKeige
Lisa K. Buckser
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

Sara Hicks Stewart
Christopher R. Miller
THE STEWART FIRM
107 Saint Francis St., Ste 1508
Mobile, AL 36602

Andrew R. Jacobs
FITZSIMMONS RINGLE
& JACOBS, P.C.
50 Park Place
Newark, NJ 07102
For Plaintiff Intervenor
Leon Fassler

Chris Kessler
GEORGE M. FLEMMING
& ASSOCIATES
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056-3019
For Plaintiff Intervenors
Robert and Kathleen Carr

David J. Bershad
Robert A. Wallner
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY 10119

George A. LeMaistre, Jr.
Thomas J. Woodford
MILLER HAMILTON SNIDER & ODOM, LLC
Post Office Box 46
Mobile, AL 36601

Joseph J. DePalma
GOLDSTEIN, LITE & DePALMA, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102

H. Sullivan Bunch
BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.
4041 North Central Ave.
Suite 1101
Phoenix, AZ 85012
For Plaintiff Intervenor
James McKaige

-11-

**FOR THE PLAINTIFF INTERVENORS:**

_[signature]_

David J. Bershad
Robert A. Wallner
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY 10119

Max W. Berger
Douglas M. McKeige
Lisa K. Buckser
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

George A. LeMaistre, Jr.
Thomas J. Woodford
MILLER HAMILTON SNIDER & ODOM, LLC
Post Office Box 46
Mobile, AL 36601

Sara Hicks Stewart
Christopher R. Miller
THE STEWART FIRM
107 Saint Francis St., Ste 1508
Mobile, AL 36602

Joseph J. DePalma
GOLDSTEIN, LITE & DePALMA, LLC
Two Gateway Center, 12ᵗʰ Floor
Newark, NJ 07102

Andrew R. Jacobs
FITZSIMMONS RINGLE
& JACOBS, P.C.
50 Park Place
Newark, NJ 07102

H. Sullivan Bunch
BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.
4041 North Central Ave.
Suite 1101
Phoenix, AZ 85012
For Plaintiff Intervenor
James McKaige

Leon Fassler
For Plaintiff Intervenor

Chris Kessler
GEORGE M. FLEMMING
& ASSOCIATES
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056-3019
For Plaintiff Intervenors
Robert and Kathleen Carr

NWK2: 508461.03

-11-

**FOR THE PLAINTIFF INTERVENORS:**

David J. Bershad
Robert A. Wallner
MILBERG WEISS BERSHAD
HYNES & LERACH LLP
One Pennsylvania Plaza
New York, NY 10119

Max W. Berger
Douglas M. McKeige
BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP
1285 Avenue of the Americas
New York, NY 10019

George A. LeMaistre, Jr.
Thomas J. Woodford
MILLER HAMILTON SNIDER & ODOM, LLC
Post Office Box 46
Mobile, AL 36601

Sara Hicks Stewart
Christopher R. Miller
THE STEWART FIRM
107 Saint Francis St., Ste 1508
Mobile, AL 36602

Joseph J. DePalma
GOLDSTEIN, LITE & DePALMA, LLC
Two Gateway Center, 12th Floor
Newark, NJ 07102

Andrew R. Jacobs
FITZSIMMONS RINGLE
& JACOBS, P.C.
50 Park Place
Newark, NJ 07102
For Plaintiff Intervenor
Leon Fassler

H. Sullivan Bunch
BONNETT FAIRBOURN FRIEDMAN
& BALINT, P.C.
4041 North Central Ave.
Suite 1101
Phoenix, AZ 85012
For Plaintiff Intervenor
James McKatge

Chris Kessler
GEORGE M. FLEMING
& ASSOCIATES
1330 Post Oak Boulevard, Suite 3030
Houston, Texas 77056-3019
For Plaintiff Intervenors
Robert and Kathleen Carr

NWJX2: 508461.03

SENT BY: Case 1:05-cv-11204-WGY    Document 6-2    Filed 02/15/2005    Page 126 of 120    ;# 2/ 2

# 8.    COUNTERPARTS

This Amendment to the Settlement Agreement may be executed in any number of counterparts, all of which when taken together shall constitute one agreement binding on all parties hereto, notwithstanding that all parties are not signatories to the same counterpart.

DATED this _____ day of February, 1999.

FOR THE DEFENDANT:

By: _____
Executive Vice President &
General Counsel
GAF BUILDING MATERIALS CORP.

By: _____
Executive Vice President &
General Counsel
GAF MATERIALS CORP.

Andrew T. Berry
McCARTER & ENGLISH
Four Gateway Center
100 Mulberry Street
P.O. Box 652
Newark, NJ 07101-0652

FOR THE PLAINTIFF SETTLEMENT CLASS:

_____
Kenneth G. Gilman
GILMAN AND PASTOR, LLP
One Boston Place, 28th Floor
Boston, Massachusetts 02108

James Vance
CUNNINGHAM, BOUNDS, YANCE,
CROWDER AND BROWN
1601 Dauphin Street
Mobile, Alabama 36604

-10-

TOTAL P.02

EXHIBIT E

**IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA**

PENNY COLEMAN, JEX R., and ANN H.
LUCE, JR., EDWARD and LUCIAN S. (POPPY)
FIELDS, EDWARD R. DILLON and JOCELYN
EDELSTON, individually and on behalf
of a class of similarly situated persons,

Plaintiffs,

vs.

GAF BUILDING MATERIALS CORPORATION

Defendant.

Civil Action No.:

CV-96-0954-GALANOS

**ORDER APPROVING THE CLASS NOTICE PROGRAM**

The parties have filed a proposed Notice Program for the consideration of this Court. This Court finds that the proposed Notice Program meets the criteria for notice as articulated in Rule 23 of the Alabama Rules of Civil Procedure and relevant caselaw.

IT IS THEREFORE ORDERED BY THE COURT, that:

The proposed Notice Program submitted by the parties is approved and the Notice Program shall be implemented forthwith.

SO ORDERED this _____ day of November, 1998.

HONORABLE CHRIS GALANOS,
Judge Circuit Court of Mobile County, Alabama

NWK2: 473771.01

**EXHIBIT F**

IN THE CIRCUIT COURT OF MOBILE COUNTY, ALABAMA

PENNY COLEMAN, JEX R. and ANN H.
LUCE, JR., EDWARD and LUCIAN S. (POPPY)
FIELDS, EDWARD R. DILLON and JOCELYN
EDELSTON, individually and on behalf of a class
of similarly situated persons,

    Plaintiffs,

vs.

GAF BUILDING MATERIALS CORPORATION,

    Defendant.

Civil Action Number:

CV-96-0954-GALANOS

FINAL ORDER AND JUDGMENT

This matter came before the Court on March 12, 1999, on the joint motion of the Plaintiff Class and Defendant GAF Building Materials Corporation, GAF Corporation and GAF Materials Corporation (collectively "Defendant" or "GAF") for final approval of the proposed Settlement as set forth in the Settlement Agreement and Amendment to Settlement Agreement (collectively, the "Settlement" or "Settlement Agreement" or "Agreement"), pursuant to the Court's Preliminary Approval Order of September 25, 1998.[1]

In compliance with the Court's order approving the Notice Program, a broad and extensive notice campaign of individual notice and publication through national and local newspapers,

---

[1] The Settlement Agreement and the Amendment to the Settlement Agreement are incorporated herein by reference. Certain terms used herein, indicated by initial-letter capitalization, shall have the meaning and definition set forth in the Settlement Agreement filed with this Court on September 24, 1998, which is incorporated herein by reference.

periodicals, and the internet commenced in November, 1998 to inform the Class of the Settlement,

of the Fairness Hearing, and of the Class members' rights to exclude themselves ("opt out") or object

to, or comment on, the Settlement.  Class counsel responded to all written and telephone inquiries

from Class members.

The parties appeared at the hearing by their respective attorneys of record.  An opportunity

to be heard was given to all persons requesting to be heard in accordance with the Preliminary

Approval Order, whether represented by counsel or not.  The Court has heard, read and considered

presentations and evidence in support of the proposed Settlement, the submissions of objectors, and

the written comments of Class members.

The entire matter of the proposed Settlement having been duly noticed, heard and considered

by the Court, and for all of the reasons stated by the Court at the proceedings on March 12, 1999,

and as specifically enumerated in the Findings of Fact and Conclusions of Law ("Findings of Fact

and Conclusions of Law") filed herewith and incorporated by reference herein,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:**

1.    This Court has jurisdiction over the claims of Settlement Class members asserted in

this Action and over all parties to the Action, including the Settlement Class.

2.    The Court has determined that the members of the Settlement Class include:  All

Persons who have owned, or own as of the date of Final Order and Judgment, Property in the United

States or its Territories on which GAF Shingles manufactured from January 1, 1973 through

December 31, 1997, have been installed.  Excluded from the Settlement Class are:  (a)  All Persons

who, in accordance with the terms of this Agreement, properly execute and timely file during the Opt

-3-

Out Period a request for exclusion from the Settlement Class; (b)  All Persons who released Prior Released Claims asserted or which could have been asserted against Defendant, arising out of, or relating to, GAF Shingles; (c) All Persons who resolved through final judicial action Prior Claims against Defendant arising out of, or relating to, GAF Shingles; and (d)  All Persons who were or are builders, developers, contractors, manufacturers, wholesalers or retailers of Property, except as to ownership of their personal dwellings or commercial Property.

3.    The notice given to the members of the Class fully and accurately informed the Class members of all material elements of the proposed Settlement and their opportunity to participate in or be excluded from the Settlement; was the best notice practicable under the circumstances; was valid, due and sufficient notice to all Class members; and complied fully with Rule 23 of the Alabama Rules of Civil Procedure, the United States Constitution, due process, and other applicable law.  A full opportunity has been afforded to the Settlement Class to participate in the Fairness Hearing, and all Class members and other persons wishing to be heard have been heard. Accordingly, the Court determines that all members of the Settlement Class who have not timely elected to opt-out from the Settlement Class in the manner prescribed in the Notice are included in the Settlement Class and are bound by this Final Order and Judgment.

4.    The Court finds that, for the reasons set forth in its Findings of Fact and Conclusions of Law, the applicable requirements of Alabama Rule of Civil Procedure 23 have been satisfied with respect to the Settlement Class and the Settlement of its claims.

5.    Rule 23(a)(1) has been satisfied.  The Class consists of thousands of owners of homes or structures on which GAF roofing shingles were installed and incorporated nationwide, thereby

-4-

making individual joinder impracticable.

6.    The commonality requirement of Rule 23(a)(2) has been satisfied.  In the context of this Settlement, which obviates the need for adjudication of individual issues like reliance and damages, there are numerous common questions of fact and law alleged in the Complaint, including whether GAF roofing shingles were defectively designed, whether GAF roofing shingles failed to perform as advertised and warranted, whether GAF intentionally, recklessly or negligently failed to disclose and/or concealed their knowledge of that alleged defect, whether GAF intentionally, recklessly or negligently misrepresented the nature, quality and performance of GAF roofing shingles, whether GAF's product caused physical injury to Class members' homes or structures, whether GAF's course of conduct constituted fraudulent suppression and/or fraudulent misrepresentation, whether GAF breached its express written warranty, and whether Class members are entitled to, and the amount of, compensatory damages (including consequential damages for damage to other portions of the roof structure).

7.    The typicality requirement of Rule 23(a)(3) has been satisfied.  In the context of this Settlement, the claims of all Class members and the claims of the representative plaintiffs arise from the same product, practice or course of conduct of or by Defendant and are based upon the same legal theories.  The Class representatives, like all Class members, own property on which allegedly defective GAF roofing shingles have been installed and incorporated.  The Class representatives, like all Class members, have allegedly sustained physical injury arising out of GAF's roofing shingles and/or its common course of conduct.  The Class representatives have pursued the same legal theories available to Class members.

-5-

8.   The adequacy of representation requirement of Rule 23(a)(4) has been satisfied. In the context of this Settlement, the representative plaintiffs' interests have been co-extensive with, and not in conflict with, the interests of all Class members. The representative plaintiffs have the same legal and factual claims and the same type of alleged damages as all members of the Class, and are members of the Class they seek to represent. Further, they have prosecuted this action vigorously, and have shouldered the responsibilities of serving as representative plaintiffs for the Class. Additionally, they have retained counsel with extensive experience in certifying, litigating, and settling complex nationwide class actions, including those involving consumer fraud and defective products. Class counsel have expended many hours effectively preparing this case for trial and litigating it vigorously on behalf of the Class. Plaintiffs and their counsel have fairly and adequately protected the interests of the class.

9.   The predominance and superiority requirements of Rule 23(b)(3) have been satisfied in this case as well. In the context of this Settlement, which obviates the need for adjudication of individual issues and eliminates the manageability requirement, Common questions of law and fact predominate over individual questions affecting Class members. Finally, in the context of this Settlement, the class action mechanism has proven superior to other available methods for adjudication and resolution of this case.

10.   Accordingly, pursuant to Rule 23(a), Rule 23(b), and Rule 23(c) of the Alabama Rules of Civil Procedure, the Court reaffirms its preliminary certification of the Settlement Class for purposes of final approval of the Settlement. The Court notes that Defendant opposed, and continues to oppose, the Class treatment of this case for litigation purposes. Nothing in this Order purports to

-9-

extinguish or waive Defendant's procedural rights to continue to oppose class treatment to the extent

otherwise allowed under Rule 23, should the Settlement fail to become effective. Defendant has

stipulated and agreed to class certification for Settlement purposes only.

11.    Pursuant to Rule 23(e) of the Alabama Rules of Civil Procedure, and for the reasons

set forth in the Findings of Fact and Conclusions of Law, the Court hereby grants final approval to

the Settlement Agreement and finds that it is fair, reasonable, and adequate and in the best interests

of the Settlement Class as a whole. The objections which were filed, timely or otherwise, have been

considered by the Court and are overruled. Accordingly, the Court directs that the Settlement

Agreement be consummated in accordance with the terms and conditions of the Agreement.

12.    As of the date hereof, and subject only to the occurrence of the Settlement Date (as

defined in the Settlement Agreement), Class Plaintiffs and all members of the Settlement Class who

have not properly excluded themselves, on behalf of themselves and any person claiming by or

through them (collectively the "Releasing Party"), shall be deemed conclusively to have fully,

completely and forever RELEASED and DISCHARGED the Defendant of and from any and all

individual, private rights of action and Settled Claims, defined as any claim, liability, right, demand,

suit, matter, obligation, damage, loss or cost, action or cause of action, of every kind and description,

in law or equity, that the Releasing Party has, had or may have, whether known or unknown, asserted

or unasserted, latent or patent, that is, has been, or could reasonably have been or in the future might

reasonably be asserted by the Releasing Party and against the Defendant either in this Action or in

any other action or proceeding, in this Court or any other court or forum, regardless of legal theory,

and regardless of the type or amount of relief or damages claimed, arising from or in any way

-7-

relating to Damage to the GAF Shingles as defined in the Agreement (collectively referred to as the "Settled Claims"). Without limiting the scope of the foregoing, "individual, private rights of action" and "Settled Claims" shall include, but are not limited to: (a) any claim for Damage to GAF Shingles as defined in the Agreement; (b) any claim for breach of any federal law, state law, common law or other law, statute, regulation or ordinance; (c) any claim for breach of any duty imposed by law or by contract; (d) any claim based on principles of tort or warranty; (e) any claim arising from or in any way related to the promotion, design, specification, use, manufacture, production, sale, or distribution of GAF Shingles and/or any alleged defects in GAF Shingles; (f) any claim for emotional distress, mental anguish or similar damages associated with any of the above; (g) any claim for penalties, punitive damages, exemplary damages, damages based upon a multiplication of compensatory damages, or attorney fees, whether allowed by federal law, state law or common law; and (h) any claim for declaratory or injunctive relief associated with the above. Nothing included herein shall abridge or restrict the right of the Attorney General or District Attorney from pursuing an action pursuant to Ala. Code § 8-19-10(f); provided, however, that no person or entity, whose claims have been released pursuant to this settlement, shall seek or receive further compensation or recovery for the claims released herein.

13.    However, the term "individual, private rights of action" and "Settled Claims" does not include the following: (a) any claim for bodily injury (including wrongful death), including claims for pain and suffering, emotional distress, mental anguish or similar damages associated with such bodily injury; (b) claims for Consequential Damages (as described in the Settlement Agreement) and as limited by Section E.6.a of the Settlement Agreement; and (c) Prior Released

-8-

Claims.

14.     Each Settlement Class member who has not timely opted out of the Settlement Class, on behalf of himself and any Person claiming by or through him (the "Releasing Party"), regardless of whether any Settlement Class member executes and delivers a written release, shall be deemed to and does hereby RELEASE and DISCHARGE the Defendant, of and from any and all individual, private rights of action and Settled Claims and related subrogation claims of the Releasing Party's subrogees or insurance carriers. The Releasing Parties shall be deemed to and do hereby release and forever discharge any other persons or entities from claims for which Defendant could be liable to any Releasing Parties, arising out of or based on the design, manufacture, advertising, sale, or distribution of GAF Shingles. The Releasing Parties specifically reserve any and all other claims and causes of action against any and all other persons or entities not parties to this Agreement.

15.     Nothing in this Settlement Agreement shall prejudice or in any way interfere with the rights of the Settlement Class members and the Defendant to pursue all their rights and remedies against any persons or entities not a party to this Agreement, except those rights and remedies that are released in the Settlement Agreement.

16.     The Release provided in Section I of the Settlement Agreement is hereby approved and made effective and incorporated herein by reference.  In addition, the Court hereby finds that the Release of individual, private rights of action and Settled Claims is valid and entitled to preclusive effect in subsequent litigation.

17.     Named Plaintiffs and all members of the Settlement Class who have not filed timely and properly executed notices of exclusion from the Class are barred and permanently enjoined from

-6-

filing, initiating, asserting, maintaining, pursuing, continuing, or participating as a litigant (by intervention or otherwise) in any action, whether an individual lawsuit or class action, in any court, asserting any of the claims dismissed herein or any of the "individual, private rights of action" and "Settled Claims" (as defined in the Settlement Agreement) against the Defendant and such other Persons as more particularly described in the Settlement Agreement. A list of Class members who properly and timely excluded themselves from the Class shall be filed by GAF with the Clerk within 15 days of entry of this Order.

18. This Action and all individual, private rights of action and Settled Claims asserted herein on behalf of the Settlement Class are dismissed in their entirety on the merits, with prejudice and without costs. The Court hereby awards and approves attorneys' fees and costs as provided by the Settlement, and the Court recognizes that these attorneys' fees and costs constitute defense expenses appropriately incurred by Defendant in the litigation and settlement of this Action.

19. Without affecting the finality of this Final Order and Judgment, this Court reserves and maintains exclusive and continuing jurisdiction over this Action and the Parties, including all members of the Settlement Class, and all matters pertaining to the Settlement Agreement; the consummation of the Settlement Agreement; the validity of the Settlement Agreement; the construction and enforcement of the Settlement Agreement; and the entry and enforcement of this Final Order and Judgment, including, in the event of reversal, vacation or modification of this Final Order and Judgment, jurisdiction to revoke this Final Order and Judgment in its entirety and to reinstate all claims dismissed or claims, actions, causes of action and liabilities released pursuant to the Settlement Agreement, and all other matters pertaining to the Settlement.

-10-

20.    Under the express terms of the Settlement Agreement, Defendant shall have the right to terminate the Settlement Agreement, withdraw from this Settlement Agreement, and to secure abrogation of this Final Order and Judgment, if the conditions set forth in Section 5M(2) of the Amendment to Settlement Agreement are met (i.e., "Termination of the Agreement"). If Defendant elects to terminate the Settlement Agreement and to withdraw from the Settlement Agreement, Defendant retains the right to file a motion under Rule 60(b) of the Alabama Rules of Civil Procedure, at which time the Court will vacate this Final Order and Judgment under Rule 60(b)(5) and 60(b)(6) of the Alabama Rules of Civil Procedure. This Court hereby expressly holds that Defendant's right to terminate and withdraw from this Settlement Agreement is a condition subsequent to the entry of this Final Order and Judgment; and this Final Order and Judgment is, and shall remain, final unless and until Defendant exercises its right to terminate and withdraw from this Settlement Agreement.

21.    If the Settlement Agreement is terminated in accordance with the terms of the Settlement Agreement, the Settlement Agreement (except those provisions that, by their terms, expressly survive termination of the Settlement) shall have no force or effect, all settlement negotiations, settlement proceedings and statements made in connection therewith shall be deemed inadmissible in any other or further proceedings, and the Parties to this Action shall be restored to their respective positions existing as of the date hereof, preserving all of their respective arguments, claims and defenses.

22.    Class Counsel are awarded a total of $4,125,000 for attorneys fees and costs, to be paid by GAF. Intervenors' Counsel are awarded a total of $1,000,000 for attorneys fees and costs,

-11-

to be paid by GAF.

23.    Any disputes or controversies arising with respect to the enforcement and interpretation of the Settlement Agreement or this Final Order and Judgment shall be presented by motion to the Court.

24.    The Court has set forth its Findings of Fact and Conclusions of Law in a separate order entered contemporaneously herewith.

25.    There being no reason for delay, the Clerk of the Court is hereby directed, pursuant to Ala. R. Civ. P. 54(b), to enter this order as a FINAL ORDER AND JUDGMENT

**IT IS SO ORDERED.**

Dated: _____, 1999    _____
Hon. Chris Galanos
Circuit Court Judge

**NIXON PEABODY LLP**
100 Summer Street
Boston, MA 02110
617-345-1000
Attorneys for Defendants
  BMCA and Samuel Heyman

|  |  |
|---|---|
| PETER GACICIA, individually and on behalf of a class of similarly situated persons,<br><br>                     Plaintiffs,<br><br>    vs.<br><br>GAF BUILDING MATERIALS CORPORATION, GAF CORP. AND SAMUEL HEYMAN,<br><br>                   Defendants. | UNITED STATES DISTRICT COURT<br>DISTRICT OF MASSACHUSETTS<br><br>Civil Action No. 1:05-CV-11204-WGY<br><br><br>**AFFIDAVIT OF SAMUEL HEYMAN** |

I, **SAMUEL HEYMAN**, do on oath hereby depose and say:

1.     I am a defendant in the above-captioned lawsuit, and submit this Affidavit in support of the arguments raised on my behalf in the Motion to Dismiss filed with this Court.

2.     I am a resident of New York.  I am not a resident of the Commonwealth of Massachusetts.  I do not personally own any property in Massachusetts.

3.     I do not have an office in Massachusetts.  I do not personally conduct any business in Massachusetts.

4.     My office is located in New York City.  I do not work in New Jersey. Specifically, I do not work in the building (1361 Alps Road, Wayne, New Jersey) to which plaintiff sent the Summons and Complaint in this case.

5.     The Summons and Complaint was sent to GAF Materials Corporation in Wayne, New Jersey. I did not sign for these papers.

Signed under the pains and penalties of
perjury this ___4th___ day of July, 2005

_____

SAMUEL HEYMAN